No. 78,313

ARTHUR J. GEORGE and JANET GEORGE, *Appellees/Cross-appellants*, v. CAPITAL SOUTH MORTGAGE INVESTMENTS, INC., *et al.*, *Appellants/Cross-appellees*.

(961 P.2d 32)

Opinion filed June 19, 1998.

*Jeffrey M. Friedman*, of Friedman & Weddington, Attorneys, L.L.P., of Austin, Texas, argued the cause, and *Thomas M. Martin*, of Lewis, Rice & Fingersh, L.C., of Kansas City, Missouri, was with him on the briefs for appellant/cross-appellee Capital South Mortgage Investments, Inc.

*Spencer J. Brown*, of Deacy & Deacy, of Kansas City, Missouri, argued the cause, and *Brett C. Coonrod*, of the same firm, was with him on the briefs for appellant/cross-appellee Castanuela.

*John H. Fields*, of Kansas City, argued the cause, and *Edwin Fields*, of the same firm, was with him on the brief for appellees/cross-appellants.

The opinion of the court was delivered by

ABBOTT, J.: The plaintiffs, Arthur J. and Janet George, sought to obtain financing for the purchase of a house from a quasi relative-friend. However, due to the alleged misrepresentation of those parties who secured the financing, the plaintiffs unintentionally borrowed more money than they intended to borrow and at a higher interest rate. Thus, the plaintiffs brought suit in Wyandotte County District Court against several parties involved in securing the loan, including Creative Capital Investment Bankers (Creative), Capital South Mortgage Investments, Inc. (Capital), and Elio Castanuela. Creative did not appear at trial, and the plaintiffs received a default judgment against it. At trial, the plaintiffs alleged

that Capital and Castanuela, the appellants herein, engaged in a joint venture with Creative to defraud the plaintiffs and commit usury against them. The jury agreed with the plaintiffs and entered a verdict against the appellants for fraud and usury. The plaintiffs were awarded actual damages for usury, punitive damages against Capital in the amount of $50,000, punitive damages against Castanuela in the amount of $50,000, an equitable reformation of the note from a $60,000 loan to a $32,000 loan, and attorney fees. The appellants appealed the jury's verdict and the damage award to the Court of Appeals. The plaintiffs cross-appealed, alleging that the actual damages or usury penalties awarded against the appellants were inadequate. The case was transferred to this court pursuant to K.S.A. 20-3018(c).

The plaintiffs purchased a home in Kansas City, Kansas, from Opal Morgan, Arthur George's step-grandmother. The home had an appraised value of approximately $60,000. However, Morgan planned to sell the house to the plaintiffs for $40,000. The only condition was that she needed all of the money up front.

The plaintiffs were not able to obtain conventional financing, so they approached Creative in an effort to obtain a loan. Creative indicated that it would be able to assist the plaintiffs in obtaining financing. At that time, Morgan signed a written, notarized agreement dated August 26, 1993, which stated: "I, Opal N. Morgan, agree to sell my house as it is for $40,000." This agreement was prepared and signed due to the plaintiffs' meeting with a representative from Creative who told the plaintiffs that he would need a document stating that Morgan was selling her house for $40,000. The plaintiffs then executed a note between themselves and Morgan for $40,000, which was secured by Morgan's house. The note did not include an interest rate or other terms because the parties did not know who would loan the money and were unsure of the terms of the note. Instead, the note stated that all $40,000 was due and payable upon the plaintiffs' financing being completed by September 30, 1993.

Later, this note was altered by the plaintiffs, who changed the principal amount owing to Morgan from $40,000 to $60,000, and initialed these changes. The plaintiffs testified that this change was

made because Creative told them that a lender would only lend them a certain percentage of the cost of the house. Thus, the plaintiffs understood that to get a $40,000 loan, it had to appear that they would be paying $60,000 for the house. Since the house was valued at $60,000, Creative suggested changing the principal amount of the note to $60,000. The plaintiffs agreed to such change, but testified that they had made it clear that they did not want to actually borrow more than $40,000. According to the plaintiffs, Creative assured them that the change would be a change on paper only. In the end, Creative requested the alteration of the note and the plaintiffs initialed this alteration. In the margin of the amended note is a handwritten message stating, "Attention: Margie; From: Stacy Bennett." Bennett is a representative of Creative, and Margie is employed by Capital.

Subsequently, the plaintiffs added a one-page typed amendment to the original note, which included a $60,000 principal, as well as an interest rate and terms. In the amendment, the plaintiffs agreed to pay Morgan $60,000 and to pay this amount in a monthly installment of $440.26 per month over a 10-year period. At the end of the 10-year period, the remaining balance would become due. The annual interest rate on the unpaid principal balance was 8%. Finally, the plaintiffs executed an entirely new note showing a principal balance of $60,000 and an interest rate of 8%. Under this note, the plaintiffs were to pay $440 per month until both the principal and interest were paid off in full. All of these notes showed that the plaintiffs owed the principal directly to Morgan without the involvement of any third-party financing.

After this note was entered into, Capital sent a fax to Guarantee Title, the title company, asking Guarantee Title to prepare a title insurance policy for Capital, showing that it would issue a loan for $60,000. The policy was issued on October 25, 1993, listing Capital as the proposed insured, and the amount of the insurance as $60,000.

Also, after the plaintiffs entered into the note with Morgan, Morgan signed a promissory note endorsement. The endorsement was payable to Capital, and was to be a permanent rider on the promissory note executed by the plaintiffs for $60,000. This endorse-

ment amounted to an assignment of the final $60,000 note, between Morgan and the plaintiffs, to defendant Capital from Morgan. Prior to making this assignment, Morgan provided Capital with a mortgage estoppel certificate, advising Capital that she (Morgan) had the authority to transfer the mortgage. With this authority, Morgan also assigned the mortgage of her house to Capital, at the same time that she assigned the note from the plaintiffs. Capital, in turn, assigned this note and mortgage to Castanuela.

The plaintiffs had no knowledge that Creative had also obtained Morgan's signature on a document entitled "Standard Option To Purchase Agreement," without explaining to Morgan anything about the document. The document refers to a note in the amount of $60,000, with a remaining unpaid balance of $60,000. Also in the document, Creative offers to purchase the note for the sum of $35,000. However, Morgan never received $35,000 from Bennett. Instead, on or about October 4, 1993, Creative informed the plaintiffs that they needed to give Morgan a down payment check for $5,000. Thus, on October 4, 1993, Mr. George wrote Morgan a check for $5,000 and faxed a copy of the check to Creative.

On November 22, 1993, Capital sent the assignments, together with the final $60,000 note and a letter of closing instructions, to Terry Garner, a closing agent with Guarantee Title. This letter stated that Guarantee Title would receive a wire transfer in the amount of $60,000 from Collins Marketing for the funding of the transaction, that Morgan was to receive $32,000 out of the $60,000 fund from Collins Marketing, and that the remainder of the funds were to be paid to Capital (after deducting Guarantee Title's escrow and recording fee). The letter also indicated that the assignment of the $60,000 note from Capital to Castanuela had already been executed. In this letter, Capital asked that the documents transferring the note and mortgage from Capital to Castanuela not be shown to the plaintiffs. The closing agent, Garner, followed the instructions as they were set out in the letter. At the time the deed and the note were finally executed and filed with the Wyandotte County Records, the assignments were also filed by the closing agent.

Garner does not recall Castanuela's name coming up prior to the receipt of this letter on November 22, and she did not have any contact with him. Prior to the letter, Garner had always been under the impression that Morgan was to receive $40,000. Garner was never given any explanation as to why the remainder of the $60,000 funds were paid to Capital.

Garner, who had 5 years of experience as an escrow closer for Guarantee Title, testified that she involved her boss with this transaction because she was not comfortable with some parts of the transaction and she wanted his opinion. She testified:

> "A. I've never known a lender to receive these kind of funds after a closing. I have no idea. This is a completely different deal than I'm used to seeing."

Prior to closing, the plaintiffs had already paid Morgan $5,000 as a down payment, as instructed by Capital. Therefore, at the closing, the plaintiffs expected Morgan to get $35,000, for a total of $40,000. However, Creative informed the plaintiffs that Morgan would only receive $32,000 at the closing. Consequently, the plaintiffs gave Morgan another note for an additional $3,000. This note was signed at the December 14, 1993, closing.

Janet George testified concerning the December 14, 1993, closing as follows:

> "Q. [By Mr. Fields] Did you realize when you were signing the papers there on the 14th of December that you were obligating yourself to pay back $60,000 over a 30-year period?
> "A. No, I did not.
> "Q. What did you think you were obligating yourself to pay back?
> "A. Forty Thousand.
> "Q. And why did you have that belief?
> "A. Because Stacy with Creative Capital Investment informed us that that's all we had to pay."

The plaintiffs thought the $60,000 they had heard about was the appraised value of the home. They never thought they were agreeing to pay back $60,000. According to their testimony, the plaintiffs told Creative that it was okay to use the figure $60,000 on the loan papers, as long as they did not have to pay any extra money over $40,000. The plaintiffs did not receive any papers at the December

14, 1993, closing. They were not informed that Capital received $27,832 (most of which went to Castanuela) out of the $60,000 funds from Collins Marketing, or that the $60,000 note had been assigned to Castanuela.

At the time closing occurred, the maximum allowable interest rate was 8.79%, as established through the trial court's judicial notice of the Kansas usury laws. At trial, an employee of Brotherhood Bank & Trust, Pamela Sweeney, calculated that assuming a loan of $32,000, at an interest rate of 8.79%, payable in monthly installments over 30 years, the monthly payment requirement would be $252.33. The total interest over the life of such a loan would be $56,564.93. She also calculated that a loan of $60,000, at an 8% interest rate, payable in installments over 30 years, would require a monthly payment of $440.26, and total interest of $94,531.26.

Arthur George testified that at no time prior to closing did he have any dealings or speak with anyone at Capital; all of his dealings were with Creative. However, just prior to the December closing date, Janet George did have a few brief telephone conversations with someone at Capital inquiring about the closing date. Janet George knew about Capital because she had asked Creative what company was financing them, and Creative had told her that Capital was financing them. Creative also told Janet George that Capital was a lender out of Texas.

A former employee of Creative, Patricia Bolin, testified that she began working at Creative in October 1993. Bolin was aware of telephone contacts between Stacy Bennett, a representative of Creative, and Capital. According to Bolin, Bennett both made, as well as received, phone calls from Capital. Bolin testified that these calls specifically related to the plaintiffs because Creative did not yet have a lender for them.

Eventually, the plaintiffs discovered that they had taken out a $60,000 loan and owed $60,000, rather than $40,000, as they had believed. On July 7, 1994, the plaintiffs filed a petition against Creative, Capital, and Castanuela. The plaintiffs alleged that all three had engaged in a joint enterprise to commit fraud and usury on the plaintiffs.

Creative never filed an answer, and default judgment was taken by the plaintiffs against Creative. The jury rendered a verdict against Capital and Castanuela, finding that Creative, Capital, and Castanuela had engaged in a joint venture and together had committed fraud and usury on the plaintiffs.

After the jury returned this verdict in favor of the plaintiffs, the trial court held a separate post-trial hearing on damages. The trial court required Capital to credit the plaintiffs with the excess interest that the plaintiffs had paid prior to the action in calculating their future payment of the loan. The trial court also awarded the plaintiffs $14,140.51 in attorney fees, which was almost the entirety of the plaintiffs' attorney fees. Finally, the trial court awarded the plaintiffs $250,000 in punitive damages against Creative, $50,000 in punitive damages against Capital, and $50,000 in punitive damages against Castanuela.

Capital filed a motion for judgment notwithstanding the verdict or in the alternative a motion for new trial, which the trial court denied. Capital and Castanuela timely appealed from the trial court's judgment.

## I. PUNITIVE DAMAGES

The plaintiffs filed a verified petition on July 7, 1994. Concurrent with the filing of the suit, the plaintiffs filed a motion to allow an amended pleading to include punitive damages. The verified petition and the motion were served on the defendants. However, no affidavits alleging any substantial facts to support punitive damages were attached to the motion, nor were any such supportive facts mentioned or included in the motion.

A status conference was conducted. At this conference, it was agreed to and ordered by the court that all discovery would close May 1, 1995, "at which time the parties will submit an Agreed Pretrial Order." At this status conference, the plaintiffs did not request a hearing on their motion to file an amended petition and request punitive damages. Counsel for Capital prepared the pretrial order. None of the parties had their pretrial questionnaires on file by May 1, 1995. The plaintiffs' pretrial questionnaire was prepared May 16, 1995, and filed May 18, 1995. Paragraph 4 of the

plaintiffs' pretrial questionnaire mentioned a request to amend their petition and ask for punitive damages against Creative, Capital, and Castanuela. In paragraph 13, the plaintiffs mentioned that a motion to amend the petition and include punitive damages was pending. Counsel for Capital put the pending motion in the pretrial order, and all counsel approved the order. At the hearing on the parties' pretrial motions immediately before trial, the trial court mentioned the provision in the pretrial order concerning the plaintiffs' request for punitive damages and the motion which had been filed but never heard. The court stated:

"Technically what we've had here is the parties agreed to the pretrial order. That language is contained in the pretrial order, so, the plaintiff is protected in that regard from the timeliness argument as to whether or not punitive damages are allowed. That's something way ahead of all of us at this particular point. I'd like to get going . . . I don't think [I'm] in error when I indicate that this is a little premature at this point."

Capital had filed a written motion in limine, asking that punitive damages not be mentioned. Castanuela made a similar oral motion at the hearing for pretrial motions. In response to these motions, the trial court stated: "Nobody's going to mention anything about or use that word punitive in any way at this juncture." The plaintiffs' counsel then informed the court and counsel that it had not been its intention to do so at that time. The defendants then objected to the plaintiffs' motion to amend the petition and request punitive damages, claiming that no hearing on the motion had been held, no affidavits supporting the motion had been filed by the plaintiffs, no opportunity for opposing affidavits had been provided to the defendants, and no notice had been provided that a hearing on the motion was going to take place on the morning of trial. The trial court rejected the defendants' objections and granted the plaintiffs' motion to amend their petition and request punitive damages. An amended petition was filed on May 25, 1995, the last day of trial. In so holding, the trial court stated:

"The argument about the requirement of the affidavits is—I agree with Mr. Fields that the original petition was verified, alleges serious intentional behavior on the part of the defendants which would apprise any reasonable person that this is not

a negligence action per se, and that there would be a request for additional punitive damages."

Upon conclusion of the trial, the court issued its instructions to the jury. The defendants objected to an instruction being given on the issue of punitive damages, claiming that the plaintiffs had not properly followed the statutory requirements regarding the amendment of their petition to request punitive damages. The defendants' objections were overruled, and the trial court gave an instruction on punitive damages to the jury.

The jury entered a verdict in favor of the plaintiffs, finding all three defendants had engaged in fraud and usury through a joint venture. The plaintiffs filed a memorandum prior to trial in support of their application for punitive damages on May 6, 1996. Capital responded, objecting again to the award of punitive damages on the grounds that the plaintiffs had not satisfied the statutory requirements for amending a petition and requesting punitive damages. Castanuela also objected to the award of punitive damages on the same grounds. The trial court issued a memorandum decision, rejecting the defendants objections and awarding punitive damages to the plaintiffs in the amount of $250,000 against Creative, $50,000 against Capital, and $50,000 against Castanuela. Capital and Castanuela challenge this award of punitive damages on appeal. The defendants claim that the plaintiffs did not properly comply with the statutory requirements in amending their petition to request punitive damages, specifically K.S.A. 60-3703. This statute provides:

"No tort claim or reference to a tort claim for punitive damages shall be included in a petition or other pleading unless the court enters an order allowing an amended pleading that includes a claim for punitive damages to be filed. The court may allow the filing of an amended pleading claiming punitive damages on a motion by the party seeking the amended pleading and on the basis of the supporting and opposing affidavits presented that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim pursuant to K.S.A. 60-209, and amendments thereto. The court shall not grant a motion allowing the filing of an amended pleading that includes a claim for punitive damages if the motion for such an order is not filed on or before the date of the final pretrial conference held in the matter."

Here, the defendants were served with the motion to amend at the same time they were served with the petition. It is true that the motion was not accompanied by an affidavit, but the plaintiffs claim that their verified petition, asserting facts which supported the claim for punitive damages, served as a legal equivalent of an affidavit. This verified petition was also served on the defendants. Both the motion to amend and the verified petition were served on the defendants well before the pretrial order was filed. The pretrial order included the plaintiffs' request for punitive damages. The defendants knew of their request for punitive damages, knew the motion had yet to be ruled on, and knew it must be heard at the hearing prior to trial. The defendants had the opportunity to file affidavits in opposition to the motion if they chose to do so.

In support of their argument that the verified petition, which included facts supporting a claim for punitive damages, was the legal equivalent of an affidavit supporting a claim for punitive damages, the plaintiffs cite to *Conaway v. Smith*, 853 F.2d 789 (10th Cir. 1988). In *Conaway*, the plaintiff brought a First Amendment action, and the trial court granted summary judgment to the defendants. The plaintiff appealed. In challenging the grant of a motion for summary judgment in federal court, the party opposing the motion must allege specific facts which indicate genuine issues requiring a trial for resolution. In attempting to allege such facts in his appeal, the plaintiff did not file an affidavit. Instead, he simply relied on the specific facts he had asserted in his verified complaint. The court found that this was proper. In so holding the court stated:

"Although a nonmoving party may not rely merely on the unsupported or conclusory allegations contained in his pleadings, a *verified complaint may be treated as an affidavit* for purposes of summary judgment if it satisfies the standards for affidavits set out in Rule 56(e). [Citations omitted.] Rule 56(e) requires that the affidavit be based on personal knowledge, contain facts which would be admissible at trial, and show that the affiant is competent to testify on the matters stated therein. Conaway's verified complaint as to the factual allegations in support of his free speech claim meets these requirements.

"Conaway did not rely solely on the 'mere' pleadings to oppose the motion for summary judgment regarding his free speech claim. In addition to the factual allegations stated in his verified complaint, Conaway submitted certain documen-

tary evidence to substantiate his claim. Conaway also identified other documents, photos and evidence to corroborate his rendition of the events which evidence was inexplicably missing from the files of the Building Inspection Division and was therefore unavailable to him. Under these circumstances, *we will treat the verified complaint as an affidavit for the purpose of the motion for summary judgment.* We note that there may be cases where the sole reliance on a verified complaint would be insufficient to meet a nonmoving party's burden under *Celotex Corp v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), especially when the allegations contained in the pleading are merely conclusory. In this case, however, a full affidavit would serve no better purpose than the sworn, detailed, factual allegations contained in the verified complaint that were based on Conaway's personal knowledge. We see no reason, under these particular circumstances, to demand that Conaway must re-label his verified complaint as an affidavit and submit essentially the same facts to the court." 853 F.2d at 792-93.

See also *Fusaro v. First Family Mtg. Corp.*, 257 Kan. 794, 803, 897 P.2d 123 (1995) ("A significant similarity between K.S.A. 60-3703 and the trial court's approach to summary judgment or directed verdict is that under K.S.A. 60-3703 the trial court must view the evidence as disclosed from the affidavits in a light most favorable to the party moving for amendment.").

The case of *Burrowwood Assocs., Inc. v. Safelite Glass Corp.*, 18 Kan. App. 2d 396, 853 P.2d 1175 (1993), more directly addresses when a motion to amend must be ruled upon. In *Burrowwood,* the plaintiff filed a motion to amend its petition and request punitive damages prior to the pretrial conference. The motion was not ruled upon prior to the pretrial conference, but the motion was noted in the pretrial order. Thereafter, a district judge denied the motion, and the case was assigned to a different district judge for trial. After the evidence was presented at trial, the plaintiff renewed its motion to amend and the trial judge granted the motion, allowing the issue of punitive damages to be submitted to the jury. The jury awarded punitive damages to the plaintiff, and the defendant appealed. The Court of Appeals affirmed the trial court's grant of the plaintiff's renewed motion to amend the petition and request punitive damages. 18 Kan. App. 2d at 398. In so ruling, the Court of Appeals stated:

"K.S.A. 1992 Supp. 60-3703 and the ruling in *Glynos v. Jagoda*, 249 Kan. 473, 487, 819 P.2d 1202 (1991), require that the motion to amend to plead punitive damages be filed on or prior to the date of the pretrial conference. If this is not done, a plaintiff will not be allowed to make a claim for such damages. Neither the statute nor *Glynos* require, however, that a ruling on the motion must be made at the pretrial conference. Neither the statute nor *Glynos* state that, once an order denying the motion to amend has been entered, it cannot thereafter be modified to allow such a claim.

. . .

"It is axiomatic that a trial judge may reverse himself or herself during the course of an action if he or she believes an incorrect ruling has been made. Had Judge Buchanan, who heard the motion in the first place, presided over the trial, he could have, without question, reversed himself once he was satisfied of the probability that Burrowwood would prevail. Safelite would have us deny to Judge Anderson, the assigned trial judge, the same authority Judge Buchanan would have had. This we will not do.

"We hold that a motion to amend to allow a claim for punitive damages, when timely filed prior to the pretrial conference, may be considered and reconsidered as may be appropriate by the trial court at any and all times the issue is properly before the court, as was the case here." 18 Kan. App. 2d at 397-98.

Finally, the plaintiffs assert that the defendants did have notice of the hearing on the motion and an opportunity to file affidavits opposing the motion. As the plaintiffs point out, the motion and the verified petition (which equalled an affidavit) were both filed and served on the defendants well before the motion was heard. The fact that the motion was pending was noted in the pretrial order, which the defendants signed and were bound by. See *Burrowwood*, 18 Kan. App. 2d at 397-98 (indicating that a trial court may consider the defendant's evidence presented at trial in determining if motion to amend a petition to request punitive damages should be granted); *Fusaro*, 257 Kan. at 802 (indicating that a trial court may consider a defendant's evidence presented at trial, in addition to the defendant's affidavits opposing a motion to amend, in determining if motion should be granted). The defendants chose not to present any witnesses at trial. Thus, at the conclusion of the trial, when the court reconsidered the punitive damage issue, it reaffirmed its prior decision by providing the jury with a punitive damage instruction.

In *Fusaro*, 257 Kan. at 804, this court stated that "under K.S.A. 60-3703, the decision whether to permit plaintiff to amend is dis-

cretionary in that the statute provides that the court *may* allow the filing of an amended petition claiming punitive damages. Thus, our standard of review is one of abuse of discretion." However, the issue in that case was whether the plaintiff's affidavit, attached to its motion to amend, actually indicated the existence of a " 'probability that plaintiff [would] prevail on the [punitive damages] claim' " and what standard of proof must be used to judge this probability by. 257 Kan. at 801. This clearly was a question of fact to be decided by the trial court and was properly evaluated on appeal under an abuse of discretion standard of review. However, the issue herein is whether the plaintiffs properly satisfied the procedural requirements set out in K.S.A. 60-3703 by filing the motion and are entitled to prove that they could prevail on a punitive damages claim. The arguments made by the parties herein involve questions regarding the interpretation of K.S.A. 60-3703, based on the legislature's intent and statutory construction, such as: Can a verified petition be used in place of an affidavit under the statute; when must the motion be ruled upon under the statute; what type of notice for the motion's hearing is the defendant entitled to receive under the statute? "Interpretation of a statute is a question of law, and our review is unlimited." *In re Tax Appeal of Boeing Co.*, 261 Kan. 508, Syl. ¶ 1, 930 P.2d 1366 (1997). Thus, this issue should be evaluated under a de novo standard of review.

Each procedural element listed in K.S.A. 60-3703 is required for a plaintiff to properly file a motion to amend a petition and request punitive damages. These elements include: (1) the plaintiff seeking the amended pleading must file a motion to amend the petition; (2) the motion must be filed on or before the date of the final pretrial conference; (3) the plaintiff must establish that there is a probability the plaintiff will prevail on the punitive damage claim by clear and convincing evidence (*Fusaro*, 257 Kan. at 801), and (4) this proof should be based on supporting and opposing affidavits.

Herein, the plaintiffs filed a motion to amend their petition and properly served this motion on the defendants. The motion was filed before the date of the final pretrial conference. See *Sullwold v. Barcus*, 17 Kan. App. 2d 410, 417, 838 P.2d 908, *rev. denied*

251 Kan. 942 (1992). While language in certain cases is confusing as to what must occur before the pretrial conference—motion filed, affidavits filed, or ruling determined—it is clear from the language of the statute that only the motion must be filed prior to the pretrial conference. *Sullwold*, 17 Kan. App. 2d at 414-15; see *Glynos*, 249 Kan. 473, 487, 819 P.2d 1202 (1991). This was done in this case. The ruling does not need to occur prior to the pre-hearing conference. *Burrowwood*, 18 Kan. App. 2d at 397. It is preferable that the affidavits be filed simultaneously with the motion and served on the defendants prior to the pretrial conference, but certain exceptions can be made for the affidavit filing and service date if special circumstances apply. *Logan v. Logan*, 23 Kan. App. 2d 920, 933-34, 937 P.2d 967 (1997), *rev. denied* 7-11-97. Thus, the hearing and ruling date on this motion were proper, even though they occurred after the pretrial conference, because the motion itself was filed prior to the conference.

The defendants knew that the motion was pending from the time the case was filed. The pretrial order specifically stated that the motion was pending, and the defendants approved the order, thereby making the order binding on them. Thus, the defendants knew the order had to be addressed sometime between the pretrial order signing date and the trial, or at least during the trial. Similarly, the plaintiffs did not know when the trial court planned to take up the motion. This factual determination is not challenged by the defendants and will not be addressed herein.

However, this determination to grant the plaintiffs' motion was not based on supportive or opposing affidavits. Instead, the trial court found that the plaintiffs' verified petition contained sufficient information to constitute an affidavit. The trial court based its determination to grant the plaintiffs' motion to amend and request punitive damages on the plaintiffs' verified petition. The plaintiffs claim this was proper under *Conaway v. Smith*, 853 F.2d 789. The *Conaway* case does support this position and it is based on a valid rationale. Several Kansas statutes allow either a verified petition or an affidavit to support certain factual allegations; however, the statutes refer to the documents separately as a petition *or* an affida-

vit—suggesting that the two documents are not interchangeable under the Kansas statutes.

This issue involves the interpretation of a Kansas statute. This statute only uses the term "affidavit," not verified petition. "In interpreting a statute, we must give effect to its plain and unambiguous language, without determining what, in our view, the law should be." *State v. Reed*, 23 Kan. App. 2d 661, 663, 934 P.2d 157, *rev. denied* 262 Kan. 968 (1997). " '[I]n construing statutes, "[s]tatutory words are presumed to have been and should be treated as consciously chosen and, with understanding of the ordinary and common meaning, intentionally used with the legislature having meant what it said.' [Citation omitted.]" *State v. Crank*, 262 Kan. 449, 451, 939 P.2d 890 (1997), "When a statute is plain and unambiguous, the appellate courts will not speculate as to the legislative intent behind it and will not read such a statute so as to add something not readily found in the statute." *State v. Alires*, 21 Kan. App. 2d 139, Syl. ¶ 2, 895 P.2d 1267 (1995). "When construing a statute, a court should give words in common usage their natural and ordinary meaning." *Galindo v. City of Coffeyville*, 256 Kan. 455, Syl. ¶ 5, 885 P.2d 1246 (1994).

We do not believe a bright line rule should be adopted in this case concerning the verified petition because we are not satisfied the trial court gave the answering defendants a fair opportunity concerning punitive damages. The trial court did not make a final ruling until all of the evidence was in and the answering defendants had elected not to offer any evidence. Under the circumstances, we hold the answering defendants are entitled to a new trial on the issue of punitive damages only. We remand the case to set aside the punitive damage award to the answering defendants and to grant a new trial on the punitive damage issue. The punitive damage award against Creative stands.

## II. TESTIMONY

In this case, the plaintiffs challenged the total amount of the loan in question and the interest rate of the loan as improper. The plaintiffs obtained an ex parte order appointing Brotherhood Bank as an escrow agent so that Brotherhood Bank could receive all the

mortgage payments on the home during the pendency of the litigation.

By interrogatories, Capital requested that the plaintiffs identify any expert witnesses, including the subject matter to which they would testify and the substance of their opinions on that matter. On April 11, 1995, the plaintiffs answered Capital's interrogatories by stating that no expert witness had been retained at that time. The plaintiffs first contacted Pamela Sweeney about testifying in their usury case in regard to legal interest rates. Subsequently, on May 5, 1995, after the close of discovery, the plaintiffs filed an amended interrogatory answer. In answering the interrogatory on expert testimony, the plaintiffs stated: "At this time no expert witnesses have been retained. However, an expert witness may be called for the limited purpose of testifying concerning the permissible interest rates charged under K.S.A. 16-207."

A pretrial questionnaire was filed by the plaintiffs on May 18, 1995. In this questionnaire, the plaintiffs listed Sweeney as a possible witness, but they did not indicate that Sweeney would be called as an expert witness. The final pretrial conference order was not signed until May 22, 1995, the morning that trial began. In this order, the plaintiffs did not specifically identify any expert witness in regard to the usury claim.

During trial, the plaintiffs called Sweeney, an agent of Brotherhood Bank in Kansas City, Kansas, to testify. Brotherhood Bank had been previously designated as escrow agent by the court and all payments on the note in question had been made to Brotherhood Bank during the pendency of the litigation.

The defendants objected to Sweeney's testimony on the grounds of surprise and the fact that Sweeney had never been identified as an expert witness, either in the plaintiffs' response to the defendants' interrogatories or in the plaintiffs' response to the pretrial questionnaire. The defendants' objection was overruled and Sweeney proceeded to give testimony regarding the usury claim. However, Sweeney had forgotten to obtain the information regarding the proper interest rates, and, thus, the plaintiffs were forced to establish this information through judicial notice. When Sweeney could not answer the interest question, she was asked to testify

concerning mathematical calculations using assumed interest rates and assumed mortgage amounts. The defendants did not make any contemporaneous objections claiming that Sweeney was testifying as an expert. However, on appeal, the defendants allege that Sweeney testified as an expert witness and that the trial court erred in allowing her testimony because the plaintiffs had failed to identify her as an expert witness in response to the defendants' interrogatories or in the pretrial order.

As we view the record, Sweeney was not an expert witness, and she was not asked to express any belief or opinion regarding interest rates. Most book and stationery stores carry payment tables and almost any professional who deals with payments has such a table. Furthermore, the information is readily available through most computers. Sweeney simply testified to a simple mathematical computation, and her testimony comported exactly with mathematical tables. The appellants do not point out how they could have attacked her testimony. In addition, the trial judge could have taken judicial knowledge of the figures to which Sweeney testified. Therefore, any error was harmless.

### III. JOINT VENTURE

Under Kansas law, a joint venture is defined as "an association of two or more persons or corporations to carry out a single business enterprise for profit; it may be found in the mutual acts and conduct of the parties. Among acts or conduct which is indicative of a joint venture, but no single one of which is controlling in the determination, are: (1) the joint ownership and control of property; (2) the sharing of expenses, profits and losses, and having and exercising some voice in determining the division of the net earnings; (3) a community of control over and active participation in the management and direction of the business enterprise; (4) the intention of the parties, express or implied; and (5) the fixing of salaries by joint agreement." *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.*, 226 Kan. 70, 76, 596 P.2d 816 (1979).

Capital asserts that there was no evidence presented at trial of joint ownership or joint control of property between Capital and Creative; no evidence of the sharing of expenses or losses; no ev-

idence of a community of control in the management of a business enterprise; no evidence of the intention of the parties; and no evidence of the fixing of salaries by joint agreement. According to Capital, the only evidence of a joint venture between it and Creative was a representation by Creative that the lender providing the financing to the plaintiffs was Capital from Texas. Further, Morgan assigned the plaintiffs' note to Capital and Capital assigned this note to Castanuela. Finally, Capital sent a letter to the closing agent asking her not to reveal these assignments to the plaintiffs.

At trial, the closing agent testified that it is common practice for an assignment of a note to occur contemporaneously with the closing of the note and that such assignments are often done without the knowledge of the buyers. Besides Morgan's note, Capital argues that there was no evidence to indicate that it and Creative ever did business with one another in any other case, nor was there any evidence of mutual acts by the parties. Thus, Capital asserts that it was not involved in a joint venture with Creative and that there was no evidence presented at trial to support the jury's opposite conclusion.

Finally, in support of this position, Capital tries to distinguish the facts in this case from those in *Modern Air Conditioning*, 226 Kan. 70. In that case, this court upheld the trial court's submission of a jury instruction on joint venture and the jury's finding of joint venture because the parties at issue participated in negotiations together, sold assets to one another, entered into a contract with one another, and shared office space, secretarial help, and telephone lines together. This court approved the joint venture finding even though there was no evidence of an agreement between the parties expressly entering into a joint venture and no profits or losses were shared. 226 Kan. at 76-77.

Capital contends that the facts herein are distinguishable from *Modern Air Conditioning* because it and Creative were distinct corporations existing in different states that did not share office space, secretarial help, or telephone lines. Further, Capital claims that it took no part in the negotiations of the sale of the home from Morgan to the plaintiffs. Thus, Capital claims that, unlike the appellant in *Modern Air Conditioning*, it was not involved in a joint

venture with Creative. As such, Capital asserts that the evidence was insufficient at trial to support the jury's finding that it participated in a joint venture with Creative. Hence, Capital claims that it is not liable for the acts of fraud committed by Creative. Capital asks this court to reverse the verdict against it for fraud, based on its alleged involvement in a joint venture with Creative.

Castanuela also contends that there was no substantial competent evidence presented at trial to prove that he associated with Creative with the intent to carry out a single business venture for profit or that there was a community of interest among him, Creative, and Capital as to the purpose of an undertaking.

According to Castanuela, the only substantive evidence that he might have been involved in a joint venture was offered by the closing agent, Terry Garner. Garner testified that the original mortgage for $40,000 was recorded on September 23, 1993, and was rerecorded with handwritten changes raising the amount to $60,000 on October 14, 1993. However, Janet George testified that this original change in the note and mortgage in October was requested by Creative and that she had never had any contact with Castanuela and was unaware of a connection between him and Creative. Further, Castanuela contends that his name did not appear in any relation to this transaction until November 22, 1993, more than a month after the mortgage amount had already been increased to $60,000. Castanuela contends that this was not evidence of a joint venture among himself, Creative, and Capital to commit fraud on the plaintiffs.

Besides Garner's testimony, Castanuela points out that the only other witnesses who mentioned his name were the plaintiffs. Their testimony was limited to the description of the events which led to their knowledge that the note and mortgage had been assigned to Castanuela. Castanuela argues that neither plaintiff had any contact with him or had any knowledge regarding any relationship among him, Capital, and Creative.

Thus, Castanuela contends that all the evidence regarding him indicated that he was a passive investor who purchased what he thought was a $60,000 note and mortgage. According to Castanuela, the evidence presented at trial did not show that he agreed

to associate with Creative to carry out an enterprise, nor did it show that he had any community of interest with Creative in regard to the note and mortgage at issue. In fact, Castanuela contends that no evidence presented at the trial suggests that he even knew of the existence of Creative or that the mortgage he purchased had been altered in any way. As such, Castanuela asserts that the evidence was insufficient to submit a joint venture instruction regarding him to the jury or to support the jury's finding that he had in fact participated in a joint venture with Creative and Capital to commit fraud on the plaintiffs. Castanuela asks this court to strike down the jury's joint venture finding.

In response, the plaintiffs argue that there is plenty of circumstantial evidence in this case to support a finding that both Capital and Castanuela engaged in a joint venture with Creative to defraud the plaintiffs out of $27,832 plus the interest on a $60,000 note when they were only entitled to interest on a $32,000 note. See *Hammargren v. Montgomery Ward & Co.*, 172 Kan. 484, 492, 241 P.2d 1192 (1952) (holding that any cause of action may be proven by circumstantial evidence).

At the plaintiffs' meeting with Creative's representatives in mid-August 1993, the representatives said that they knew some lenders who would approve the plaintiffs, but they did not identify the lenders at that time. Before the first note and mortgage were signed on September 20, 1993, Creative mentioned Capital. Janet George asked who was financing them, and Creative described Capital as a lender out of Texas. Capital was the only lender or mortgage company whose name was mentioned. It was only after that information was conveyed to the plaintiffs that the plaintiffs were asked and agreed to increase the original note and mortgage from $40,000 to $60,000. This was on or about October 14, 1993. In the note which includes the handwritten revisions changing the amount from $40,000 to $60,000, a Creative representative had written "attention Margie." Margie is with Capital and she is the author of the closing instructions, a memorandum, dated December 3, 1993, to Terry Garner, which asks Garner not to disclose to the plaintiffs the assignment of the note and mortgage from Mor-

gan to Capital and from Capital to Creative. The original unaltered note, also has "Margy" handwritten on it.

Further, Patricia Bolin testified that in October 1993, a representative of Creative was both making telephone calls to Capital, as well as receiving telephone calls from Capital. Approximately 10 days after the escalation of the note and mortgage, Capital sent a fax to Guaranty Title requesting a mortgage title insurance policy in their favor, insuring a balance of $60,000. Among other things, the fax stated that the assignments would be sent in approximately 1 week. From that point forward, Capital, not Creative, fine-tuned the transaction to its satisfaction, preparing all documents for plaintiffs, as well as securing Morgan's signature, and issuing instructions to Guaranty Title. Finally, Capital initially obtained the extra money—$27,832. Most of this sum was returned to Castanuela. (This evidence was not presented to the trial court during the liability phase of the trial, but was presented after the jury trial at the punitive damage hearing.) Creative had no independent motive to increase the note on the evidence in this record. If this were a legitimate sale of an existent note and mortgage on the secondary market, Creative could have just as easily sold a $40,000 mortgage, secured by a $60,000 house, as it could have sold a $60,000 mortgage secured by that same house. Further, when Capital asserts that it was not even involved in the transaction until after the note had been changed, it is simply stating its side of a disputed question of fact which was resolved against it by the jury.

The plaintiffs contend that there is substantial competent evidence to support the jury's finding that Castanuela participated in a joint venture with Creative and Capital to defraud the plaintiffs: There was an inordinate delay in closing this transaction. The delay was so long that Janet George and Morgan's son made several independent inquiries. The preclosing execution of the assignment from Capital to Castanuela is evidence of Castanuela's association with the venture before it was consummated. Mr. Nichols' letter of November 22, 1993, states that the assignment of the lien document from Capital to Castanuela had already been executed. However, the assignment that was used is dated and notarized December 9, 1993. A reasonable inference is that the transaction

could not close until Castanuela funded it. The plaintiffs argue that this inference was confirmed later at the punitive damage hearing when Castanuela admitted that he provided the funds for the loan to be secured by the mortgage. According to the plaintiffs, common knowledge and experience, as well as the nature of the transaction itself, raise the inferences that Castanuela was to share in the benefits and the profits of the venture. Again, the plaintiffs contend that this was confirmed at the punitive damage hearing, when it was established that Castanuela got $20,117 of the $27,832 overcharge. Finally, the plaintiffs point to the letter of instructions to the closing agent asking that the assignment from Capital to Castanuela not be seen by any of the parties. Based on this evidence, the plaintiffs assert that there was substantial competent evidence to support the jury's finding that Castanuela participated in a joint venture to defraud the plaintiffs with Creative and Capital. The plaintiffs ask this court to uphold the jury's finding and its verdict against Castanuela for fraud.

The existence of a joint venture may be *inferred* from the facts and circumstances presented at the trial which demonstrate that the parties, in fact, undertook a joint enterprise. 46 Am Jur. 2d, Joint Ventures § 11, p. 33, § 75. The requisite intent of parties required to create a joint venture may be express or *implied. Modern Air Conditioning*, 226 Kan. at 76.

As we view the record, the evidence could be interpreted as evidence of a joint venture among Creative, Capital, and Castanuela to defraud the plaintiffs. It is not this court's place to reweigh the evidence and replace the jury's factual determination. Looking at the evidence in the light most favorable to the plaintiffs, as the standard of review requires, there was substantial competent evidence to support the jury's finding that both Capital and Castanuela participated in a joint venture with Creative to defraud the plaintiffs and are liable for the direct fraud which Creative perpetrated on the plaintiffs. This issue fails.

## IV. JURY INSTRUCTION ON JOINT VENTURE

The trial court provided the jury with an instruction on joint venture, which stated in pertinent part:

"You are instructed that a joint venture arises out of, and must have its origin in, a contract, expressed or implied, in which the parties agree to enter into an undertaking for profits in the performance of which they have a common purpose the objects or purpose of which they have a community of interest. The intent to form such a relationship must exist; a joint venture cannot arise by operation of law. However, as to third persons, the legal, and not the actual, intent of the parties controls, and the parties may be estopped in favor of third persons from denying that they are joint venturers, even though they never intended to become such."

However, the defendants claim that the instruction on joint venture was improper because it did not properly state the law in Kansas and, therefore, misled the jury as to what actually constitutes a joint venture. The defendants contend that the trial court's instruction on joint venture was so vague and meaningless as to provide no guidance to the jury. Thus, the defendants claim that the jury found a joint venture existed based on an improper instruction.

According to the defendants, the proper definition of a joint venture under Kansas law can be found in *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.*, 226 Kan. at 75-76. See also *Flight Concepts Ltd. Partnership v. Boeing Co.*, 38 F.3d 1152 (10th Cir. 1994); *Southwest Nat'l Bank of Wichita v. ATG Constr. Mgt., Inc.*, 241 Kan. 257, 260, 736 P.2d 894 (1987). These cases define joint venture and list specific acts or conduct which is indicative of a joint venture. However, the trial court's joint venture jury instruction did not include the acts or conduct which were indicative of a joint venture, as the case law definitions do. The defendants claim that if the instruction had included a list of certain acts or conduct which indicate a joint venture, then the jury would have concluded that these acts did not exist herein and, thus, a joint venture did not exist herein. As such, the defendants assert that if the jury had been properly instructed as to the full definition of a joint venture, then the jury would not have concluded that Capital and Castanuela participated in a joint venture with Creative to defraud the plaintiffs.

The trial court took its instruction on joint venture from 15 Am. Jur. Pl. and Pr. Forms (rev.), Joint Venture § 7, and this is a correct statement of law. See 46 Am. Jur. 2d, Joint Ventures § 1, cited in

*Neighbors Construction Co., Inc. v. Seal-Wells Construction Co., Inc.*, 219 Kan. 382, 385, 548 P.2d 491 (1976). Error cannot be predicated on the refusal to give an instruction when its substance is adequately covered in other instructions. Here, the substance of the factors specified in *Modern Air Conditioning* were given and they did not need to be specifically listed in the joint venture instruction for the instruction to be proper. See *Potts v. Lux*, 161 Kan. 217, 222, 166 P.2d 694 (1946).

In *Potts*, this court enumerated various factors which may be considered in determining whether a partnership exists. However, when the PIK committee defined partnership in PIK Civ. 2d 7.07, it did not set forth all the various factors which this court had previously approved in *Potts* for the purpose of determining whether a partnership existed. See *Turon State Bank v. Estate of Frampton*, 253 Kan. 621, 625, 861 P.2d 117 (1993) ("While *we do not endorse or recommend the giving of an instruction on the badges or indicia of fraud*, we think the determination of whether one should be given *should be left to the sound discretion of the trial court based upon the facts and circumstances of the particular case. We anticipate that ordinarily a trial court will not need to give such an instruction*, but if the court is of the opinion, based upon the evidence and circumstances of the case, that such an instruction is necessary for the guidance of the jury in arriving at a proper verdict, the trial court should not be precluded from giving an instruction on the badges or indicia of fraud."). (Emphasis added.)

"If the jury instructions, read as a whole, fairly instruct the jury on the law governing the case, are substantially correct, and the jury could not reasonably be misled by them, the instructions will be approved on appeal." *In re Application of City of Great Bend for Appointment of Appraisers*, 254 Kan. 699, 713, 869 P.2d 587 (1994). The trial court's jury instruction on joint venture was substantially correct and fairly instructed the jury on joint venture law.

The trial court herein used its discretion, based upon the facts and circumstances of this particular case, and decided not to include the specific facts indicating a joint venture within its joint venture jury instruction. The trial court decided that based on the

evidence and circumstances, such an instruction, including all the specific facts of a joint venture, was not necessary for the guidance of the jury in arriving at a proper verdict. The trial court's decision was not so arbitrary, fanciful, or unreasonable that no reasonable person would agree with the court. Thus, the trial court did not abuse its discretion in so ruling. See *Smith v. Printup,* 262 Kan. 587, 592, 938 P.2d 1261 (1997). This issue fails.

## V. ATTORNEY FEES

After the jury found in the plaintiffs' favor on the fraud and usury counts, the plaintiffs requested attorney fees. The trial court awarded fees to the plaintiffs' attorney in the amount of $14,140.51. On appeal, the defendants claim that the trial court erred in awarding any attorney fees at all under K.S.A. 16-207(e). Further, the defendants claim that the trial court erred in setting the amount of attorney fees at $14,140.51 because this amount included fees for both the usury count and the fraud count, for which attorney fees are not allowed.

First, the defendants assert that the trial court erred in awarding any attorney fees at all under K.S.A. 16-207(e). In Kansas, a party cannot recover attorney fees unless they are specifically provided for by the legislature. *State, ex rel., v. Sage Stores Co.,* 158 Kan. 146, 150, 145 P.2d 830 (1944) (holding that in the "absence of specific statutory authority the successful party in an action may not recover from his adversary his attorney's fees and expenses of litigation"). Two Kansas cases control—*Marshall v. Beeler,* 104 Kan. 32, 178 Pac. 245 (1919), and *Young v. Barker,* 185 Kan. 246, 342 P.2d 150 (1959).

In *Marshall,* a debtor voluntarily paid a note which contained usurious interest. After paying the note in full, the debtor filed suit under the usury statute (the predecessor to K.S.A. 16-207[e]), seeking recovery of the usurious amount paid under the note. The court rejected the debtor's argument, holding "[n]o cause of action is expressly given under the present statute to recover back from the original payee usurious interest; the borrower is given the right to set up the defense in an action on the instrument, in which case

double the amount of the excess interest is to be deducted from the amount lawfully due." 104 Kan. at 42.

In *Young*, plaintiffs/debtors filed suit against defendant/lender, seeking recovery of usurious interest paid. The debtors made all of their payments under the note. Defendant/lender argued that plaintiffs were not entitled to recover under G.S. 1949, 16-202 (1955 Supp.) (predecessor statute of K.S.A. 16-207[e]). Lender argued that the remedies under such statute could only be asserted as a defense in a collection action.

The *Young* court, while reaffirming its holding in *Marshall*, created a common-law cause of action and permitted plaintiffs to recover only the amount of interest charged by a lender in excess of the statutory rate (*i.e.*, the usurious interest paid). It also held that plaintiffs did not have a cause of action under G.S. 1949, 16-202 (1995 Supp.) because the remedies under the statute could only be used as a defense to a collection action. 185 Kan. at 257-58.

"Usury statutes are penal in nature and are to be strictly construed in favor of the lender." *Indian Springs State Bank v. Kelley's Auto Supply, Inc.*, 9 Kan. App. 2d 211, 213-14, 675 P.2d 379 (1984) (citing *Young v. Barker*, 185 Kan. 246). "Usury laws in general were designed to protect needy borrowers from unscrupulous lenders. That view of the law should therefore be adopted which will accomplish that purpose. The statutes should not be converted from 'shields of protection into swords of offense.' " *Indian Springs*, 9 Kan. App. 2d at 216 (quoting 45 Am. Jur. 2d Interest and Usury § 8, p. 22). See also *Schulte v. Franklin*, 6 Kan. App. 2d 651, 654, 633 P.2d 1151 (1981) (holding that since the usury claim was not brought as an affirmative suit for relief but was raised in defense against the plaintiffs' action for possession, then the "historical impediment to a claim for statutory usury penalties is inapplicable"; thus, the defendant was entitled to statutory penalties, pursuant to K.S.A. 1980 Supp. 16-207[d] as a remedy for the usurious interest charges).

Black's Law Dictionary 419 (6th ed. 1990) defines a "defense" as "[t]hat which is offered and alleged by the party proceeded against in an action or suit, as a reason in law or fact why the plaintiff should not recover or establish what he seeks. That which

is put forward to diminish plaintiff's cause of action or defeat recovery." Here, the defendants did not proceed against the plaintiffs in an action or suit. Thus, the plaintiffs did not offer or allege the usury claim as a reason in law or fact why the defendant should not recover. The plaintiffs did not put forward the usury claim to diminish the defendants' cause of action or to defeat recovery. Instead, the plaintiffs affirmatively brought this usury claim against the defendants so that they no longer had to continue to pay the improper interest.

K.S.A. 16-207 does not authorize an offensive usury action; it only authorizes the defensive use of a usury claim. Thus, the plaintiffs' offensive usury claim was not authorized by or based upon the usury statute, K.S.A. 16-207, despite the parties' belief throughout the trial. Neither this court nor the legislature has ever held that attorney fees are recoverable for a successful usury claim brought under the common law. "[A]bsent specific statutory authority the successful party in an action may not recover from his adversary his attorney's fees and expenses of litigation." *State, ex rel. v. Sage Stores Co.*, 158 Kan. at 150. Thus, the plaintiffs are not entitled to recover attorney fees after successfully litigating an offensive, common-law usury claim. The trial court's award of attorney fees to the plaintiffs after the jury found in their favor was in error. The award of attorney fees is reversed.

This result does not mean that a borrower must risk foreclosure, as the plaintiffs argue, in order to challenge usurious interest in a defensive manner. The borrower can always bring an offensive common-law usury action to challenge usurious interest, just as the plaintiffs did herein. See *Young*, 185 Kan. at 246. Such borrower is simply not entitled to recover attorney fees should its claim be successful. Thus, this result does require a borrower to risk foreclosure in order to be entitled to attorney fees upon successfully bringing a usurious interest defense. This is unfortunate, but not completely unreasonable. Some litigants are not entitled to recover attorney fees at all. As such, if the legislature provides for attorney fees, it can make the receipt of such fees risky so as to avoid numerous usury actions. The legislature provided that the statutory usury claim, pursuant to 16-207, providing for attorney fees, shall

only be used defensively, not offensively, and the legislature has not made allowances for attorney fees in common-law usury actions used offensively. This is the legislature's prerogative, and it is not this court's place to change these rules. If the legislature sees the unfairness in these rules, then it is free to change them.

## VI. MOTION FOR A NEW TRIAL

After the jury handed down a verdict in the plaintiffs' favor, Capital and Castanuela both timely filed a motion for judgment notwithstanding the verdict or in the alternative a motion for a new trial. Rule 4D of the Wyandotte County District Court's local rules provides that post-trial motions not heard on regular motion days shall be specially set by the judge and notice given to all counsel. The defendants' motions were not heard on a regular motion day, so the defendants attempted to obtain a hearing date specially set by the judge. Specifically, Castanuela claims to have orally contacted the court twice. However, the trial court never set a date to hear the motion. Instead, the trial judge informed the defendants that he expected to retire immediately and he would not set a date to hear the motion since he was leaving. The court indicated that a hearing would not be set or take place until the newly assigned trial judge took over the bench and scheduled the hearing.

However, on December 9, 1996, hours before he retired, the trial judge issued a memorandum decision on the defendants' post-trial motion, denying the motion in its entirety. According to the defendants, the trial judge made such ruling without a hearing and without any notice of a hearing. The defendants allege that they were not given the opportunity to present oral argument in support of their motion at a hearing, in violation of Wyandotte County District Court Local Rule 4D. The defendants assert that they were prejudiced by this rule violation. Moreover, the defendants point out that the trial court's memorandum decision explicitly referred to conversations with the plaintiffs' counsel regarding these motions. According to the defendants, these conversations constituted ex parte communication in violation of the Kansas Code of Civil Procedure. Further, the defendants claim that it was improper and unfair for the plaintiffs to have had an opportunity to present oral

argument on the motions when the defendants were not afforded this same opportunity. The defendants claim that the trial court abused its discretion by flagrantly violating these rules of procedure. The defendants ask this court to strike down the trial court's memorandum decision on the motion and allow the defendants the opportunity to file a motion, have a hearing set, have notice of the hearing, and present oral argument at the hearing in support of their motions.

In response, the plaintiffs argue that neither ex parte communication nor a violation of the local rules occurred by the trial court's ruling on the defendants' motion. First, the plaintiffs assert that they did not participate in prohibited ex parte communication with the trial judge regarding the defendants' post-trial motions. In support of this position, the plaintiffs cite to the trial court's memorandum decision, which states in pertinent part:

"Plaintiffs' counsel has informed the court that he feels all of the issues raised have been ruled on previously by this court in pretrial, trial, and post-trial hearings. He therefore indicates he will not be filing any written response."

The plaintiffs claim that they do not recall if it was the judge's secretary or the judge himself who made the inquiry about the plaintiffs' intention to file a response to the defendants' motion. The trial court's memorandum does not make this clear. However, the plaintiffs assert that the record does not support, and it is not true, that the plaintiffs had an opportunity to present oral argument while the defendants were not afforded such an opportunity. As such, the plaintiffs claim that no improper ex parte communication occurred between themselves and the trial court concerning the trial court's denial of the defendants' post-trial motions.

Moreover, the plaintiffs claim that the trial court did not violate the local rules when it denied the defendants' post-trial motions. The local rule at issue, 4(D), provides in pertinent part:

"D. *Special Motions*: Any motion requiring a special setting, including motions for a new trial and similar post-trial motions, and motions where oral evidence is to be offered, shall be specially set by the Judge of the division to which the case has been assigned, and notice of such setting shall be given by the attorney obtaining the setting."

Further, Supreme Court Rule 133 (1997 Kan. Ct. R. Annot. 163) provides:

"If the motion also contains a request for oral argument, or if within five days of the service of the motion an adverse party serves and files a request for oral argument, no ruling shall be made on the motion without opportunity being given to counsel to present such arguments. . . . In the absence of any request by either party for oral argument in accordance with this Rule, the judge may set the matter for hearing or rule upon the motion forthwith and communicate the ruling to the parties."

Based on Supreme Court Rule 133, the plaintiffs assert that local rule 4(D), stating that motions where oral argument is to be offered shall be specially set by the judge, is not self-executing. Under Supreme Court Rule 133, the plaintiffs claim, when a party files a motion that needs oral argument, such as a motion for a new trial, the party has the obligation to specifically request oral argument in writing in order to receive it. Here, however, the plaintiffs point out that the defendants did not include a request for oral argument in either of their post-trial motions. Without such written request for oral argument, the plaintiffs contend that under Supreme Court Rule 133, the trial court was entitled to rule on the motions without argument on the motions. Thus, the plaintiffs assert that the trial court did not commit error in ruling on the defendants' motions without first hearing oral argument from either party. See *Bowen v. City of Kansas City*, 231 Kan. 450, 453, 646 P.2d 484 (1982).

As far as the record before us is concerned, the defendants never asked the trial court for a hearing. The defendants claim that they asked twice, but the judge refused because he was retiring. There is no record of the defendants' request for oral argument. Certainly, a defendant is entitled to rely on the trial court's word about when a hearing will be set, but such reliance will not hold up at the appellate level unless the request is in the record. As such, it appears from the record that the defendants never requested a hearing for oral argument either orally or in writing, as required by Supreme Court Rule 133. Without such request under Supreme Court Rule 133, local rule 4(D) never takes effect and the trial judge is not required to set a case for special hearing. As the preface to Wyandotte County Local Rules make clear, these two rules work

in conjunction together. Local Rule 4(D) is not self-executing but requires a proper request for oral argument hearing, under Supreme Court Rule 133, in order to take effect. Since such a request was not made here, neither the retiring trial judge nor the newly appointed trial judge was ever required to set the motion for an oral argument hearing. As such, the trial court did not err in ruling on the motion without setting a hearing or providing the defendants with an opportunity for oral argument.

Further, it does not appear that the trial court provided the plaintiffs with an opportunity for improper, ex parte oral argument. In his memorandum decision, the trial court was simply explaining the plaintiffs' response to the motion, which was none. It was not clear how the judge got this information. However, it was clear that any communication between the judge and the plaintiffs did not afford the plaintiffs an opportunity to present oral argument on the motion. Instead, it simply appears that the plaintiffs communicated to the judge that they had no response to the defendants' motion. This was not prejudicial to the defendants in any way and does not require a reversal of the trial court's ruling on the defendants' motion. This issue fails.

## VII. PENALTIES AWARDED TO THE PLAINTIFFS

K.S.A. 16-207(e) provides:

"Any person so contracting for a greater rate of interest than that authorized by this section shall forfeit all interest so contracted for in excess of the amount authorized under this section; and in addition thereto shall forfeit a sum of money, to be deducted from the amount due for principal and lawful interest, equal to the amount of interest contracted for in excess of the amount authorized by this section and such amounts may be set up as a defense or counterclaim in any action to enforce the collection of such obligation and the borrower shall also recover a reasonable attorney fee."

In awarding damages, the trial court interpreted this section of the statute and stated:

"The Court interprets the plain language of the statute in question to mean that 'shall forfeit all interest . . . in excess' requires defendants to pay back or be credited *for excess interest paid by the plaintiffs prior to this action.*

"The Court interprets the rest of the statute which states that the Defendants shall 'additionally' forfeit a sum of money to be deducted from the 'amount due

for lawful principal and interest' as merely rewriting the wrongful instrument to include in the future only that which is lawfully allowed. This is accomplished by the paragraph above with a new note showing a balance of $28,617.26 at 8.79% for 30 years at $252.66 per month."

Based on this interpretation of the statute, the court did not deduct an additional sum of money from the principal and legal interest on the loan equal to the amount of illegal interest contracted for. Instead, the trial court reformed the note so that the plaintiffs only owed legal interest in the future and credited those future payments with the illegal excess interest amounts that the plaintiffs had already paid.

The plaintiffs claim that the trial court misinterpreted this statute and that they were entitled to an additional deduction from their loan, equal to the amount of the excess interest, as a penalty against the defendants. On their cross-appeal, the plaintiffs ask this court to award them this additional damage, pursuant to K.S.A. 16-207, against the defendants.

However, the plaintiffs did not bring a defensive statutory usury action pursuant to K.S.A. 16-207. Instead, they brought an offensive common-law usury action. Thus, under their common-law action, the plaintiffs are not entitled to the statutory damages listed in K.S.A. 16-207. Such penalty, if it even exists under the statute, is not provided for under the common-law usury claim. As such, the plaintiffs are not entitled to this damage award and the trial court properly denied it, although based on a different reason. This issue fails.

Affirmed in part and reversed in part.