(994 P.2d 651)

No. 82,886

DEALERS LEASING, INC., *Appellee,* v. SANDRA I. ALLEN, D/B/A
THE BREAKFAST CLUB, *Appellant,* v. RONALD "RONNIE"
CAZEL D/B/A BILLARDS & GAMES, INC., *Appellant.*

Opinion filed December 23, 1999.

*Roger C. Kidd,* of Roger C. Kidd, P.A., of Wichita, for appellant, Sandra I. Allen.

*James R. Gilhousen,* of Crockett & Gilhousen, of Wichita, for the appellee.

Before PIERRON, P.J., ELLIOTT, J., and ROGG, S.J.

PIERRON, J.: In this breach of contract case and counterclaim for violations of the Kansas Consumer Protection Act, Sandra I. Allen, d/b/a The Breakfast Club, appeals a judgment in favor of Dealers Leasing, Inc., (Dealers) and Ronald Cazel, d/b/a Billiards & Games, Inc. (Billards & Games). Allen argues the trial court erred in finding that she failed to prove her claims under the Kansas Consumer Protection Act (KCPA). We reverse and remand.

The facts are for the most part undisputed. Allen operates a small family restaurant in Wichita known as The Breakfast Club. The business is not incorporated and is a sole proprietorship.

On November 20, 1997, Michael Duranleau came into The Breakfast Club offering to lease Allen a compact disc jukebox to replace her current one. Duranleau had with him a blank invoice

from the supplier of the jukebox, Billiards & Games. Duranleau filled out the invoice, which described the jukebox and stated a total purchase price of $3,710. Allen signed the invoice. Duranleau also had with him a Business Lease Application from Dealers, which he filled out on her behalf and had her sign; he then submitted it to Dealers. Dealers approved Allen's credit and typed up a lease, and Duranleau delivered the lease to Allen for her signature on November 21, 1997. All of the contractual and lease paperwork was entered into and signed by Allen at The Breakfast Club.

The lease purchase called for a lease term of 36 months with a $138 monthly payment and a prepayment of $414. Allen admits she did not read the lease before she signed it. Allen testified she understood the deal with Duranleau was to lease a nice used CD jukebox, that it would be 80% filled with CDs, and that the jukebox would be hooked up to the existing speakers in the restaurant. She testified she thought Duranleau worked for Dealers.

The jukebox was purchased by Dealers from Ronnie Cazel, the proprietor of Billiards & Games, for $3,710. Cazel delivered the jukebox on Friday, November 21, 1997, and attempted to set it up. It is undisputed that when the jukebox arrived at The Breakfast Club, the bill changer would not work, the page turner for the CDs was broken, the jukebox was only 5% filled with CDs, and the jukebox could not be hooked up to the existing speaker system because there was a part missing and the delivery and installation people from Billiards & Games did not have time to hook it up. Allen testified the delivery people said they would be right back to hook up the machine to the speaker system. They never came back.

On Saturday, November 22, 1997, Cazel removed the jukebox to make the necessary repairs, left a loaner machine in its place, and said he would bring the purchased jukebox back on Monday. Allen called repeatedly on Monday to find out when the jukebox would be delivered. Cazel attempted to deliver the purchased jukebox on Tuesday, November 25, 1997. He picked up the loaner machine at that time. Cazel's employees stated they did not have time to hook up the jukebox to the speaker system. Allen refused to let them deliver the jukebox and told them to not bring back

the machine until such time as they could hook it up to the speaker system. Cazel's employee could not tell Allen when they would be back to complete the delivery and hook the jukebox up to the speakers. Allen testified that after that, she was "done with it."

On Tuesday, November 25, 1997, Allen called Dealers and spoke with Jerry McDonald, the Vice President in charge of equipment leasing. Allen expressed her dissatisfaction with the situation and indicated she wanted to cancel the lease. McDonald called Cazel at Billiards & Games and discussed the situation. Cazel called the Breakfast Club and spoke with Debbie Shain, the head waitress. When asked whether the speakers would be hooked up, Cazel replied, "I won't guarantee nothing." Allen and her headwaitresses testified that between November 26, 1997, and December 14, 1997, Allen repeatedly called Billiards & Games to speak with Cazel, but she never reached him, and he never returned any of her messages.

On December 3, 1997, McDonald wrote to Allen trying to remedy the situation and indicated that Dealers refused to cancel the lease with Allen unless Cazel returned the money Dealers paid for the jukebox. On December 14, 1997, Allen wrote to Dealers asking it to void the leasing contract and return her $414. Thereafter, Dealers and Cazel made numerous attempts, through letters and phone calls, to make the deal work. Allen never responded.

When it became clear that Allen would not honor the lease agreement, Dealers sold the jukebox and applied the proceeds against her unpaid balance. Dealers sued Allen for an alleged deficiency balance of $3,301.67 (against a total purchase price of $3,710), under a breach of contract claim. Allen counterclaimed against Dealers for violations of the Kansas Consumer Protection Act, breach of contract for delivering a broken jukebox, and for lost profits. Allen later filed a cross-petition against Cazel, d/b/a Billiards & Games, Inc., and brought them into the lawsuit as a third-party defendant.

Following a bench trial, the court granted judgment in favor of Dealers and Cazel. The court ruled the transaction was a financing lease controlled by Article 2A of the Uniform Commercial Code and that Allen was not entitled to cancel the lease. On Allen's

counterclaims, the court held that Duranleau was neither an express nor an implied agent of Dealers, that Dealers had no duty to give Allen a 3-day right to cancel, that the door-to-door sales provisions of the Kansas Consumer Protection Act only apply to home solicitations, and that if a duty to give notice of the right to cancel existed, it was only on the supplier, which was Cazel under this transaction. The court also found Allen was not entitled to lost profits because she failed to mitigate her damages, and since Allen failed to prove her claims under the Kansas Consumer Protection Act, Dealers was entitled to attorney fees.

Allen appeals.

The first question for resolution is to what extent the transaction in this case is controlled by the Kansas Consumer Protection Act (KCPA). Dealers does not object to applying the KCPA to this transaction. However, Dealers argues the trial court correctly interpreted the KCPA to hold Dealers did not violate the act.

The transaction in this case falls within the purview of the KCPA. "Consumer" is defined as "an individual or *sole proprietor* who seeks or acquires property or services for personal, family, household, *business* or agricultural purposes." (Emphasis added.) K.S.A. 50-624(b). "Supplier" is defined as "a manufacturer, distributor, dealer, seller, lessor, assignor, or other person who, in the ordinary course of business, solicits, engages in or enforces consumer transactions, whether or not dealing directly with the consumer." K.S.A. 50-624(i). "Consumer transaction" means "a sale, lease, assignment or other disposition for value of property or services within this state (except insurance contracts regulated under state law) to a consumer; or a solicitation by a supplier with respect to any of these dispositions." K.S.A. 50-624(c). The lease agreement between Allen and Dealers was a consumer transaction under the KCPA.

When the legislature amended the definition of "consumer" in 1991 by adding sole proprietor to the statutory definition, the legislature was merely clarifying the state of the law. L. 1991 ch. 159, § 1. The *1973* comments to K.S.A. 50-624 state: "This definition of 'consumer' is intentionally broad. It covers not only individuals who seek or acquire goods, services or real estate for personal, family or household purposes, but also *sole proprietors* such as

farmers and business people." (Emphasis added.) Clearly, the legislature contemplated sole proprietors as consumers when the KCPA was enacted in 1973. The 1991 amendment to K.S.A. 50-624 only clarified the existing definition. "Ordinarily, courts presume that, by changing the language of a statute, the legislature intends either to clarify its meaning or to change its effect." *Watkins v. Hartsock*, 245 Kan. 756, 759, 783 P.2d 1293 (1989).

This court must also determine whether the trial court correctly applied the Kansas Consumer Protection Act. The initial inquiry is whether the case at bar involved a "door-to-door sale" under K.S.A. 50-640, namely, whether a door-to-door sale can occur at a business. Stated another way, are the door-to-door sale provisions of the KCPA limited to home solicitations?

Where the trial court has made findings of fact and conclusions of law, the appellate court's review is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. *State v. Haskins*, 262 Kan. 728, 731, 942 P.2d 16 (1997). However, interpretation of a statute is a question of law permitting unlimited review by this court. *Rose & Nelson v. Frank*, 25 Kan. App. 2d 22, 24, 956 P.2d 729, *rev. denied* 265 Kan. 886 (1998).

The express language of K.S.A. 50-640 does not limit door-to-door sales to home solicitations. We will not alter or ignore language in a statute to change its meaning. See *In re Marriage of Killman*, 264 Kan. 33, 43, 955 P.2d 1228 (1998) (when a statute is plain and unambiguous, the appellate courts will not speculate as to the legislative intent behind it and will not read such a statute so as to add something not readily found in the statute). K.S.A. 50-640(c) defines door-to-door sale in the following manner:

"(1) 'Door-to-door sale' means a sale, lease or rental of consumer property or services with a purchase price of $25 or more, whether under single or multiple consumer transactions, in which the supplier or the supplier's representative personally solicits the sale, including those in response to or following an invitation by the consumer, and *the consumer's agreement or offer to purchase is made at a place other than the place of business of the supplier.*" (Emphasis added.)

In addition to providing a general statutory definition, K.S.A. 50-640(c)(1) identifies transactions which are not "door-to-door sales."

By specifying transactions which are *not* door-to-door sales, the legislature intended for all other transactions which fall within the statute's general definition to be considered door-to-door sales. See *In re Marriage of Killman*, 264 Kan. at 42 (when legislative intent is in question, we can presume that when the legislature expressly includes specific terms, it intends to exclude any items not expressly included in the specific list). The exceptions to door-to-door sales include transactions:

"(A) Made pursuant to prior negotiations in the course of a visit by the consumer to a retail business establishment having a fixed permanent location where the property is exhibited or the services are offered for sale on a continuing basis; or

"(B) in which the consumer is accorded the right of rescission by the provisions of the consumer credit protection act (15 USCS 1635) or regulations issued pursuant thereto; or

"(C) in which the consumer has initiated the consumer transaction and the property or services are needed to meet a bona fide immediate personal emergency of the consumer, and the consumer furnishes the supplier with a separate dated and signed personal statement in the consumer's handwriting describing the situation requiring immediate remedy and expressly acknowledging and waiving the right to cancel the sale within three business days; or

"(D) conducted and consummated entirely by mail or telephone; and without any other contact between the consumer and the supplier or its representative prior to delivery of the property or performance of the services; or

"(E) in which the consumer has initiated the transaction and specifically requested the supplier to visit the consumer's home for the purpose of repairing or performing maintenance upon the consumer's real or personal property. If in the course of such a visit, the supplier sells the consumer the right to receive additional services or property other than replacement parts necessarily used in performing the maintenance or in making the repairs, the sale of the additional property or services would not fall within this exclusion; or

"(F) pertaining to the sale or rental of real property, to the sale of insurance or to the sale of securities or commodities by a broker-dealer registered with the securities and exchange commission. K.S.A. 50-640(c)(1).

As cited by the trial court and the parties, the lone Kansas case to discuss K.S.A. 50-640 is *Moore v. R.Z. Sims Chevrolet-Subaru, Inc.*, 241 Kan. 542, 738 P.2d 852 (1987). The trial court utilized *Moore* for authority to restrict the 3-day right to cancel a door-to-door sales transaction to home solicitations and not to solicitations at business premises. Dealers cites *Moore* for the court's treatment of the statutory comment to K.S.A. 50-640.

"Kansas Comment 1973 to K.S.A. 50-640 makes it clear that the main target of the statute is the home solicitation sale. In such circumstances, a person may be quietly watching his or her television set, answer the unexpected doorbell, and within thirty minutes have signed up for ten years of dancing lessons. The statute gives the gullible consumer an opportunity to consider and reflect upon such a purchase and cancel the same if desired." 241 Kan. at 553.

*Moore* is not authority restricting door-to-door sales strictly to home solicitations. Rather, it provides that the "main target," not the sole target, of the statute is the home solicitation. The factual situation in *Moore* clearly fell within the purview of the door-to-door sale exception listed in K.S.A. 50-640(c)(1)(A), and the *Moore* court upheld the trial court's finding pursuant thereto. Having sufficient reason to uphold the trial court's decision, in dicta, the *Moore* court stated it did not have sufficient evidence to determine whether the Moore transaction was for business or personal use. 241 Kan. at 553.

As communicated in K.S.A. 50-640 and stated in *Moore*, the one-on-one in-person sales transaction can be a high pressure situation. In these situations, the legislature gives the consumer a cooling off period to reconsider the situation after the pressure is gone. K.S.A. 50-640(b).

However, these one-on-one in-person sales transactions do not occur only at the threshold of the front door of someone's house. Limiting the door-to-door sales provisions of the KCPA to home solicitations does not correspond with the general language of K.S.A. 50-640. The legislature provides that any time one of these high pressure one-on-one sales transactions occurs and *the consumer's agreement or offer to purchase is made at a place other than the place of business of the supplier*, the supplier is required to provide multiple oral and written notices of the consumer's 3-day right to cancel the transaction. K.S.A. 50-640. By setting forth several exceptions to the rule, the legislature has recognized the same pressures are not evident in certain situations, such as when prior negotiations have occurred at the business location of the supplier, or where the consumer has initiated the transaction, or where the negotiations are conducted by telephone or mail. See K.S.A. 50-640(c)(1)(A) - (F).

Prior to the legislature's amendments to K.S.A. 50-640 in 1991, within the context of the door-to-door sales provisions, "consumer property" was defined within K.S.A. 50-640 as property primarily for personal, family, or household purposes. L. 1991 ch. 159, § 12. Thus, property purchased for business purposes was not covered by the door-to-door sales statute. However, by eliminating the definition of "consumer property" in the door-to-door sales statute in 1991, the legislature has defaulted to the general definitions in the KCPA and made way for transactions like those in the case at bar to be considered door-to-door sales, *i.e.*, property purchased for business use.

We acknowledge Dealers' reasoning that the 1973 statutory comments to K.S.A. 50-640 talk almost exclusively of home solicitations and the "Notice of Cancellation" set forth in the K.S.A. 50-640(b)(2) forces the consumer, if he or she wishes to cancel the transaction, to make the purchased property available to the seller "AT YOUR RESIDENCE." However, we heed the call of the legislature to liberally construe the Kansas Consumer Protection Act to promote the policy of providing consumers with a 3-day cancellation period for door-to-door sales. K.S.A. 50-623(d).

The consumer transaction between Duranleau and Allen was a door-to-door sale. All the contracts, conversations, and negotiations were made at the Breakfast Club. The same one-on-one sales presentation that took place at the Breakfast Club just as easily could have occurred at someone's home. Consequently, Duranleau was required under K.S.A. 50-640 to provide Allen with notice of a 3-day right of cancellation: (1) in boldface type near the space reserved in the contract for the signature of the consumer; (2) in a form entitled "NOTICE OF CANCELLATION" to be completed by the supplier at the time the consumer signs the door-to-door sales contract; and (3) orally at the time the consumer signs the contract. See K.S.A. 50-640(b)(1), (2), (5).

Pursuant to K.S.A. 50-640(b) it was a per se unfair and deceptive act or practice for Duranleau to fail to provide Allen with any of the statutory notices of her right to cancel the jukebox purchase. Although Allen had no notice of her right to cancel, she canceled the transaction within the 3-day cancellation period, which was

permissible. Allen's call to Jerry McDonald at Dealers requesting that he cancel the contract and then McDonald's call to Cazel at Billiards & Games explaining the situation was sufficient notice of her intent to cancel the contract. She gave written notice canceling the contract to McDonald in a letter 3 weeks after the transaction.

Because we have found violations of the door-to-door sales statutes of the KCPA, Allen is entitled to damages. In the pretrial conference order, Allen claimed damages of $6,600 for lost profits, $414 for payment of the jukebox, and $2,000 for anticipated attorney fees. Under the remedies section of the KCPA (K.S.A. 50-634), Allen is entitled to a return of the $414 payment of the jukebox and reasonable attorney fees as determined by the lower court for defense of this lawsuit.

In her counterclaim and cross-petition, Allen asked for a fine of $5,000 for each and every violation of the KCPA. However, that claim for damages did not make it into the pretrial conference order. It appears Allen has waived that measure of damages. See *Boyle v. Harries*, 22 Kan. App. 2d 686, 690, 923 P.2d 504 (1996) ("K.S.A. 60-216[a] provides that a pretrial order controls the future course of the action 'unless modified at the trial to prevent manifest injustice.' ").

As for Allen's claim of lost profits, the trial court correctly found that since Allen failed to mitigate her damages, she was not entitled to damages for lost profits. Our courts recognize the general rule of law that

"one injured by reason of a breach of contract by another is under a duty to exercise reasonable care to avoid loss or to mitigate and minimize the resulting damage. The injured party is bound to protect himself if he can do so with reasonable exertion or at trifling expense, and can recover from the delinquent party only such damages as he could not, with reasonable effort, have avoided." *In re Estate of Stannard*, 179 Kan. 394, Syl. ¶ 1, 295 P.2d 610 (1956).

The standard regarding mitigation of damages is well stated in *Theis v. duPont, Glore Forgan Inc.*, 212 Kan. 301, 307, 510 P.2d 1212 (1973): "The rule . . . is simply that damages are not recoverable for harm that the plaintiff should have foreseen and could have avoided by reasonable effort without undue risk, expense or humiliation." See also *Lindsley v. Forum Restaurants,*

*Inc.*, 3 Kan. App. 2d 489, Syl. ¶ 5, 596 P.2d 1250, *rev. denied* 226 Kan. 792 (1979) ("The duty to mitigate damages is not an unlimited one and an injured party is required only to exert reasonable efforts to prevent or minimize his damages within the bounds of common sense.").

The ultimate question is where liability should rest for Allen's damages, and that will depend on whether Duranleau was an agent of Dealers, or Billiards & Games, or both.

The trial court correctly concluded Dealers' Equipment Lease Agreement, signed by Allen, was governed by Article 2A of the Uniform Commercial Code, K.S.A. 84-2a-101 *et seq.* The lease is a "finance lease" as defined in K.S.A. 84-2a-103. Dealers role in this transaction was to provide financing. See *Siemens Credit Corp. v. Newlands*, 905 F. Supp. 757, 763 (N.D. Cal. 1994) (whether the transaction qualifies as a finance lease will be determined by the facts of each case). Consequently, under the terms of the lease and Article 2A of the Uniform Commercial Code, Dealers is entitled to disclaim warranties, and the lessee looks to the manufacturer or supplier for warranties. See *AgriStor Leasing v. Meuli*, 634 F. Supp. 1208, 1220 (D. Kan. 1986) (finance lessor not "merchant" and so makes no implied warranty of merchantability).

There is substantial competent evidence to support the trial court's conclusion that Duranleau was not an express or implied agent of Dealers. Both of those types of agency concern the intentions between the principal and the agent and not the appearance to a third party or what the third party should have known. *Kansas City Heartland Constr. Co. v. Maggie Jones Southport Cafe, Inc.*, 250 Kan. 32, Syl. ¶¶ 5, 6, 7, 824 P.2d 926 (1992). However, the court has overlooked the possibility of an apparent agency.

In *Shawnee State Bank v. North Olathe Industrial Park, Inc.*, 228 Kan. 231, Syl. ¶¶ 1, 2, 3, 613 P.2d 1342 (1980), the court summarized agency law as follows:

"The law recognizes two distinct types of agencies, one actual and the other ostensible or apparent.

"The authority of an actual agent may be either express or implied. It is an express agency if the principal has delegated authority to the agent by words which expressly authorize the agent to do a delegable act. It is an implied agency if it

appears from the statements and conduct of the parties and other relevant circumstances that the intention was to clothe the agent with such an appearance of authority that when the agency was exercised it would normally and naturally lead others to rely on the person's acts as being authorized by the principal.

"An ostensible or apparent agency may exist if a principal has intentionally or by want of ordinary care induced and permitted third persons to believe a person is his or her agent even though no authority, either express or implied, has been actually conferred upon the agent."

The trial court made no findings whether Duranleau was the apparent agent of Dealers. Dealers' marketing strategy of blanketing the community with the Equipment Lease Applications and, in this case, the actions of Duranleau, promoted the appearance of an apparent agency. Also, the trial court did not make findings concerning whether Duranleau was an agent or independent contractor of Cazel, d/b/a Billiards & Games. The question is who paid Duranleau. Was Duranleau compensated by Dealers, Cazel, or both? The determination of what constitutes an agency and whether there is any competent evidence reasonably tending to prove its existence is a question of law. See *Brown v. Wichita State University*, 217 Kan. 279, Syl. ¶ 3, 540 P.2d 66 (1975), *aff'd in part, vacated in part* 219 Kan. 2, 547 P.2d 1015, *cert. denied* 429 U.S. 806 (1976); *First National Bank of Denver v. Caro*, 211 Kan. 678, Syl. ¶ 3, 508 P.2d 516 (1973); *Hendrix v. Phillips Petroleum Co.*, 203 Kan. 140, Syl. ¶ 8, 453 P.2d 486 (1969). However, the weight to be given evidence and the resolution of conflicts therein are functions of the trier of fact. See *Highland Lumber Co., Inc. v. Knudson*, 219 Kan. 366, 371, 548 P.2d 719 (1976); *Thurman v. Cundiff*, 2 Kan. App. 2d 406, 412, 580 P.2d 893 (1978).

We therefore reverse for the reasons set out above and enter judgment for Allen. We also remand for findings of fact and conclusions of law as to whether Duranleau was an agent of Dealers, Billiards & Games, or both. We also remand for a determination of reasonable attorney fees for Allen.

Reversed and remanded.