(148 P.3d 565)
No. 94,917

Town Center Shopping Center, LLC, *Appellee,* v. Premier Mortgage Funding, Inc., *Appellant.*

 Opinion filed
December 22, 2006. 

*J. Michael Kennalley*, of Martin & Churchill, Chartered, of Wichita, for appellant.

*James R. Gilhousen*, of Crockett & Gilhousen, of Wichita, for appellee.

Before GREEN, P.J., GREENE and BUSER, JJ.

GREEN, J.: Town Center Shopping Center, LLC (Town Center), brought an action to recover rent, taxes, insurance, and common-area maintenance expenses from Premier Mortgage Funding, Inc. (Premier). Nancy Bayer, an employee of Premier, signed a lease on Premier's behalf in violation of her employment agreement. The district court determined that Premier was liable for all rent and costs, including attorney fees, under the lease. Premier appeals the judgment, arguing that there was not clear and convincing evidence to support the district court's finding that apparent authority existed to bind Premier to the lease signed by Bayer. Premier contends that the district court also erroneously determined that Premier had ratified the lease by not repudiating it. Finally, Premier challenges the district court's award of attorney fees and further maintains that the findings of fact and conclusions of law adopted by the district court were not supported by substantial competent evidence. Finding no reversible error, we affirm.

Town Center is the owner of a shopping center located at 230 and 238 West Greenway, Derby, Kansas. Town Center and Vutec Corporation acted together as landlord when leasing the property. Vutec Corporation, however, was never included as a party to this case.

Premier is a mortgage broker with more than 550 branches throughout the United States. When establishing a new branch, Premier never leases the property itself. Rather, it subleases space from an existing tenant that then becomes the branch manager. This is done to preserve the economic well-being of the company. In particular, Premier could not feasibly maintain all the base leases

itself. The subleases are cancellable by either party with a 5-day notice.

On August 13, 2003, Town Center leased 1,596 square feet of the shopping center located at 238 West Greenway to a third party, Empire Lending Company, LLC (Empire Lending) (Lease 1). The term of the lease was August 11, 2003, to October 31, 2005. The intended use of the premises was for residential mortgage broker-age services. Empire Lending could not assign or sublet without the prior written consent of Town Center.

On March 22, 2004, Bayer, a branch manager at Premier, exe-cuted an Office Lease Contract leasing the premises at 238 West Greenway from Empire Financial & Mortgage Co., LLC (Empire Financial) to Premier (Lease 2). Bayer testified that she intended to sublease the office space to Premier. The relationship between Empire Lending and Empire Financial is unclear, a contention shared by Town Center, Premier, and Bayer. Apparently Empire Financial acted as an agent of Empire Lending in executing Lease 2. Nevertheless, each company is an independent entity with in-dependent ownership. The parties further dispute whether Lease 2 was properly executed by Empire Financial on behalf of Empire Lending and whether it was proper for Premier to rely on the sublease. Premier believed Empire Lending and Empire Financial were related entities. TaWanna Kestler, an employee of Premier, testified that this assumption was based on the fact that Bayer had previously worked for Empire Lending and owned a 10% interest in Empire Financial. Because Premier believed that these com-panies were related, Premier assumed Lease 2 was a valid sublease between itself and Empire Lending.

Under Lease 2, either Premier or Empire Financial could cancel the sublease with a 5-day notice to the other party. Empire Finan-cial and Premier executed the sublease in violation of the provision of Lease 1 prohibiting assignment or sublease without the permis-sion of Town Center. Paul Stone, Town Center's leasing agent and property manager, testified that Town Center neither knew of any discussions to sublet the property, nor consented to the arrange-ment made. Kestler testified that Premier did not obtain permis-sion to sublease the premises and did not inquire whether consent

was necessary because Empire, not Premier, was bound by the terms of Lease 1. On March 22, before executing Lease 2, Premier had entered into a branch manager employment agreement with Bayer. The agreement stated that Bayer was "explicitly forbidden to negotiate with or enter into any lender agreement or any other contract of any kind . . . without the prior approval of the President of [Premier]." According to the employment agreement, the president of Premier executed Lease 2 several days later.

The parties disagree as to the fate of Lease 2. Although her testimony was somewhat unclear, someone from Premier's corporate office told Bayer that the lease needed to be in Premier's name instead of Empire's name. According to her directions from Premier, Bayer had the lease rewritten in Premier's name (Lease 3). Yet, Kestler testified that Premier was unaware of Lease 3 and believed Premier was subleasing the property under Lease 2 in accordance with typical company practices.

On April 15, 2004, Bayer signed Lease 3 with Town Center on behalf of Premier. The lease described 3,716 square feet of the shopping center located at both 230 and 238 West Greenway. The term of the lease was April 1, 2004, to May 31, 2007, and included the 1,596 square feet previously leased to Empire Lending in Lease 1. The parties also dispute the fate of Lease 1 between Town Center and Empire Lending. Town Center maintains that Lease 3 superseded the earlier lease with Empire Lending and that it terminated Lease 1 because Empire had "fallen behind" on rent. In contrast, Premier points out that "[Town Center] did not offer any evidence that the lease had been terminated." Premier's argument is based on the existence of Leases 1 and 2 as justification for remaining on Town Center's property.

Shortly after signing Lease 3, Bayer returned it to Town Center, along with a letter addressed "To Whom It May Concern," signed by Jerry Cugno, Premier's director of corporate development. The letter stated that Premier had a branch office located at 238 West Greenway in good standing and that Bayer was the branch manager. The letter did not explicitly state that Bayer had authority to act on Premier's behalf or sign the lease. Bayer testified that such letters are typically furnished to mortgage lenders to show that the

branch is in good standing and the lenders can fund loans. Kestler testified that these letters are meant to inform *only* third-party lenders, not landlords, that Bayer could do business on behalf of Premier. Both parties concede that the letter did not provide Bayer with actual authority to sign the lease on Premier's behalf. At no point did Stone or anyone else from Town Center call Premier to verify that Bayer had authority to sign the lease. On April 23, 2004, Town Center executed Lease 3.

Bayer testified that she then sent the executed lease to Premier's Florida office. The president of Premier never signed or approved Lease 3, which was contrary to the employment agreement between Premier and Bayer. Kestler testified that Premier was not aware of Lease 3 until commencement of this lawsuit.

Premier terminated its business on Town Center's premises on January 27, 2005, and vacated the premises during February 2005. Until commencement of this lawsuit, Kestler testified that Premier was unaware of the existence of Lease 3 with Town Center. On March 8, 2005, Town Center sued for possession of the premises and for $5,998.10 in rent, taxes, insurance, and common-area maintenance expenses. The district court conducted a bench trial on May 24, 2005. Town Center amended its petition to include damages through May 1, 2005, for a total amount of $13,493.18. The district court adopted Town Center's proposed findings of fact and conclusions of law. The district court ordered Premier to pay $13,493.18 in damages and attorney fees according to the terms of Lease 3.

*Is there clear and satisfactory evidence to support the district court's finding that apparent authority existed to bind Premier to the lease signed by Bayer?*

In its first point, Premier argues that Town Center failed to present clear and satisfactory evidence that Premier induced Town Center to believe Bayer had authority to bind Premier under the lease. In its opinion, there was no evidence that Premier "clothed" Bayer with authority to sign the lease and Town Center's reliance on the letter of good standing was unfounded. Accordingly, Premier contends that the district court erroneously concluded that

Bayer acted with apparent agency authority to bind Premier under the lease.

What constitutes an agency and whether there is any competent evidence that reasonably tends to prove the agency relationship is a question of law over which this court has unlimited review. Moreover, where the relationship of principal and agent is in issue, the party relying on an alleged agency relationship has the burden of establishing its existence by clear and satisfactory evidence. Whether an agency exists is a question for the finder of fact. *CIT Financial Services, Inc. v. Gott*, 5 Kan. App. 2d 224, 229-30, 615 P.2d 774, *rev. denied* 228 Kan. 806 (1980). "The province of an appellate court is to determine if the record reveals evidence on which a finding of agency could be based, not to decide whether, under proper instructions relating to the law of principal and agent, it existed as a matter of fact." *Traylor v. Wachter*, 3 Kan. App. 2d 536, Syl. ¶ 2, 598 P.2d 1061 (1979), *aff'd in part, rev'd in part* 227 Kan. 221, 607 P.2d 1094 (1980).

Because both parties admit that Bayer did not have actual authority to bind Premier under the lease, the question is whether Bayer had apparent authority. In cases where actual authority is absent, Kansas recognizes the doctrine of apparent or ostensible agency: "An ostensible or apparent agency may exist if a principal has intentionally or by want of ordinary care induced and permitted third persons to believe a person is his or her agent even though no authority, either express or implied, has been actually conferred upon the agent." *Dealers Leasing, Inc. v. Allen*, 26 Kan. App. 2d 745, 755, 994 P.2d 651 (1999). In determining whether an apparent agency existed, the court will look to the intentional acts or words of the principal to a third party and if those acts or words reasonably induced the third party to believe that an agency relationship existed. *Mohr v. State Bank of Stanley*, 241 Kan. 42, 46, 734 P.2d 1071 (1987). Therefore, the question in this case is whether the acts and words of Premier induced Town Center to enter into Lease 3 and whether that inducement was reasonable.

Premier maintains that no apparent authority existed because the letter of good standing was based on "assurances" rather than statements of fact, and that simply referring to Bayer as manager

did not indicate that Bayer was authorized to sign office leases. Premier also argues that the district court misconstrued the letter of good standing. The letter stated that Premier already *had* a branch office located at 238 West Greenway, not that 238 West Greenway *would be* a branch office in the future. In addition, Premier argues that Town Center should not have assumed Bayer had authority to sign the lease because the letter discussed only the premises at 238 West Greenway, not both 230 and 238 West Greenway which were included in the lease. Finally, Premier insists that Town Center did not conduct itself with due diligence or act in good faith in relying on the letter. Town Center did not contact Jerry Cugno or anyone else at Premier to inquire whether Bayer had the authority to sign Lease 3. Town Center did not ask for Premier's credentials to verify it was in good standing.

In rebuttal, Town Center points to several acts and circumstances that it believes shows Bayer had the apparent authority to bind Premier under the lease. First, Bayer sent a package to Town Center's manager that included Lease 3 signed by Bayer and the letter from Premier announcing Bayer was the branch manager. Second, Premier chose its own language in the letter and did not alert its addressee to any limitations on Bayer's authority. Finally, Premier alleges that use of the word "manager" insinuates some semblance of authority to the holder of that title and of the letter.

Though Premier makes some legitimate arguments, we are not persuaded that the trial court erred in rejecting these arguments and concluding that Bayer had the apparent authority to sign Lease 3 on behalf of Premier and that Town Center was reasonably induced to enter into the lease. Unfortunately, apparent authority in this case is not as obvious as in some cases. For example, in *Equity Investors, Inc. v. Ammest Group, Inc.*, 1 Kan. App. 2d 276, Syl. ¶ 8, 563 P.2d 531, *rev. denied* 225 Kan. 843 (1977), the directors of a corporation unanimously announced to a seller that they authorized the chief executive officer to execute a contract to purchase the seller's property.

Rather, this case is more analogous to *Shawnee State Bank v. North Olathe Industrial Park, Inc.*, 228 Kan. 231, 613 P.2d 1342 (1980), where the court looked more at the big picture: customs

in the field and the on-going relationship of the agent, principal, and third party. In *Shawnee State Bank*, our Supreme Court upheld a finding of apparent agency where a mortgage broker paid certain escrow fees on behalf of the purchaser without permission. 228 Kan. at 237. The purchaser originally contacted the broker to assist in obtaining financing for purchase of several lots. When the broker could not obtain permanent financing, he assisted the purchaser in obtaining alternate methods of financing. Not only was the broker in the mortgage and commercial loan business, but the broker and one of the purchaser's officers had met with the escrow agent several times before closing. At closing, the broker authorized the payment of several debts that would have otherwise resulted in liens against the property. The purchaser denied giving the broker permission to authorize payment of the debts and denied the existence of an agency relationship. The court held that the actions of the purchaser through its officers and others reasonably induced the escrow agent to rely on the apparent authority of the broker at closing. 228 Kan. at 235-37.

Unlike *Shawnee State Bank*, Premier and Town Center did not conduct business through a series of meetings and personal encounters; rather, the interaction between Premier and Town Center was limited to the letter and the lease. Lack of an ongoing relationship between Premier and Town Center, however, was sufficiently overcome by the letter that seemed to give Bayer limitless authority to conduct business on behalf of Premier. Had Town Center signed the lease simultaneously with Bayer, the result might be different. Instead, the record indicates that Town Center did not execute the lease until *after* receipt of the letter. Furthermore, because Town Center received the broad letter of authority in the same package as the lease signed by Bayer, it was not unreasonable that Town Center was induced to sign the lease under the assumption it was valid. Like the district court points out in the journal entry of judgment, Premier could have addressed the letter "To All Mortgage Lenders" rather than "To Whom It May Concern." This simple act would have explicitly limited Bayer's authority and put the recipient of the letter (Town Center) on notice as to its purpose.

Town Center also notes the definition of the word "manager." Black's Law Dictionary 979 (8th ed. 2004) defines manager as "[a] person who administers or supervises the affairs of a business, office, or other organization." More specifically, a general manager is "[a] manager who has overall control of a business, office, or other organization, including authority over other managers." Black's Law Dictionary 979. In *Professional Lens Plan, Inc. v. Polaris Leasing Corp.*, 238 Kan. 384, 391-92, 710 P.2d 1297 (1985), the court similarly relied on the definition of "dealer" in holding that an apparent agency did not exist. Based on its definition and commonly understood meaning, the word "dealer" did not imply the existence of an agency or an exclusive relationship between the parties. 238 Kan. at 391-92. In contrast, the definitions of "manager" and "general manager" do indicate the existence of a mutual relationship and the delegation of authority. Though referring to Bayer as a manager was probably not alone sufficient to establish apparent authority, the commonly understood meaning of that word in conjunction with the surrounding circumstances provided a sufficient basis to induce Town Center to sign the lease. See *Miotk v. Rudy*, 4 Kan. App. 2d 296, 300-01, 605 P.2d 587, *rev. denied* 227 Kan. 927 (1980) (where the court found no evidence other than defendant's employment as plaintiff's attorney of attorney's apparent authority to settle plaintiff's action).

Based on the facts and circumstances of this case, Town Center established by clear and satisfactory evidence that Premier's letter induced Town Center to believe Bayer had apparent authority to act on behalf of Premier. Therefore, the district court properly concluded that Premier was bound to the lease executed by Bayer.

*Did the district court err in finding that Premier failed to repudiate and therefore ratified the lease signed by Bayer?*

Premier next challenges the district court's finding that Premier ratified the lease in question by not repudiating it. More specifically, Premier contends that it was unaware of the existence of the lease until this litigation was commenced and therefore could not have effectively ratified it. Town Center does not address Premier's ratification argument.

Ratification is the adoption or confirmation by a principal of an act performed on its behalf by an agent that has acted without authority. *Brown v. Wichita State University,* 217 Kan. 279, 287-88, 540 P.2d 66 (1975). The doctrine of ratification is based upon the assumption there has been no prior authority, and ratification by the principal of the agent's unauthorized act is equivalent to an original grant of authority. Once the principal discovers the agent's unauthorized act, the principal must promptly repudiate the act or the court will presume the principal ratified the act. The key to ratification is knowledge of the unauthorized act; without a showing of the principal's knowledge, the principal cannot be deemed to have ratified the act. See 217 Kan. at 287-88.

Although Town Center argued that Premier ratified Lease 3, Town Center's argument is not supported by clear and satisfactory evidence.

*Did the district court err in awarding Town Center attorney fees?*

Premier next argues that the district court improperly awarded attorney fees to Town Center. Premier maintains that the award was inappropriate because it did not receive a notice of default or opportunity to cure.

Attorney fees cannot be granted absent statutory authority or an agreement by the parties. *Rensenhouse v. Bauer,* 33 Kan. App. 2d 148, 150, 98 P.3d 668 (2004). If the district court does have authority to award attorney fees, its decision is reviewed under an abuse of discretion standard. *Tyler v. Employers Mut. Cas. Co.,* 274 Kan. 227, 242, 49 P.3d 511 (2002).

Premier cites to section 12.18 of Lease 3 that provides for reimbursement of fees and costs: "Tenant shall pay upon demand all of Landlord's costs and expenses incurred in enforcing Tenant's obligations hereunder, including the reasonable fees of counsel . . . provided, however, that Tenant shall first be given notice of default and shall have failed to cure such default within the time allowed." According to this clause, Town Center failed to give Premier notice of default and opportunity to cure. Therefore, Premier argues that Town Center was not entitled to attorney fees.

In rebuttal, Town Center asserts that the right to cure default is only to give the tenant an opportunity to preserve his right of ten-

ancy. Town Center likens its relationship with Premier to that of a consumer under the Uniform Consumer Credit Code. See K.S.A. 16a-5-110. Town Center also cites to sections 9.2 and 9.2.3 of Lease 3 that provide for reimbursement of attorney fees without notice of default or opportunity to cure. Town Center argues that these provisions take precedence over the provision cited by Premier because they are more specific and specific provisions prevail over general provisions when interpreting a contract.

Because the district court did not indicate which provision it based its decision to award attorney fees on, the propriety of its action turns on the principles of contract interpretation. Let us hypothesize for the purposes of our following comments. If the district court based its decision on the provision cited by Premier, the district court abused its discretion in awarding attorney fees to Town Center without evidence of notice of default and opportunity to cure. In contrast, if the district court based its decision on the provision indicated in Town Center's brief, the district court properly granted attorney fees.

"The cardinal rule of contract construction requires courts to determine the parties' intent from the four corners of an instrument by construing all provisions together and in harmony with each other rather than by critical analysis of a single or isolated provision." *Starr v. Union Pacific Ry. Co.*, 31 Kan. App. 2d 906, 909, 75 P.3d 266, *rev. denied* 276 Kan. 970 (2003). A contract is given a reasonable construction and should be considered in its entirety, in order to give effect to every part. *Blair v. Automobile Owners Safety Ins. Co.*, 178 Kan. 615, 616-17, 290 P.2d 1028 (1955).

The provisions cited by both Premier and Town Center allow the district court to assess attorney fees in certain situations. On their face, these lease provisions provide only minor differences: section 12.18 requires notice of default and opportunity to cure while sections 9.2 and 9.2.3 do not. Section 9.2 states: "Upon the occurrence of any such event of default, Landlord shall have the option to pursue any one or more of the following remedies . . . without any notice or demand whatsoever." In contrast, section 12.18 provides: "Tenant shall pay upon demand all of Land-

lord's costs and expenses incurred in enforcing Tenant's obligations hereunder, including the reasonable fees of counsel . . . provided, however, that Tenant shall first be given notice of default and shall have failed to cure such default within the time allowed."

If this court adopted Premier's interpretation of the lease contract that all defaults require notice and an opportunity to cure, the introduction in section 9.2 would be useless. Therefore, circumstances must exist in which Town Center is not required to give notice of default and opportunity cure in order to keep both sections 9.2 and 12.18 meaningful.

Section 9.1 specifically lists a handful of situations that constitute default, including nonpayment of rent and failure to comply with any covenants of the lease. Because this list is enumerated, there are inevitably situations not anticipated by the parties that could be considered default. With that in mind, section 12.18 can easily be interpreted as a catchall provision dealing with defaults not anticipated by the parties or explicitly listed under section 9.1. Therefore, Town Center may still collect attorney fees in the event of an unlisted default under section 9.1. Because the default is not enumerated in section 9.1, it seems logical that Town Center would have to provide notice to Premier of the default and an opportunity to cure.

As a result, the question here is whether Premier's abandoning the premises and terminating payment of rent qualifies as default under section 9.1 of Article IX or overflows into the catchall provision under section 12.18 of Article XII. Section 9.1(a) specifically provides that default incorporates failure of tenant to pay rent within 10 days after it becomes due. Section 9.1(c) defines default as deserting or vacating the premises by the tenant for 10 days or longer. Because both definitions of default fall under the enumerated section of Article IX, Town Center did not need to provide notice to Premier and an opportunity to cure in order to collect attorney fees. On a related note, in section 9.1(b) default is defined as failure to comply with other terms, provisions, or other covenants of the lease, and this section *does* require opportunity to cure after notice of default in contrast to the surrounding sections 9.1(a) and 9.1(c). This indicates that the parties considered the impor-

tance of notice and opportunity to cure and purposefully left it out of sections 9.1(a) and 9.1(c). The failure to employ language about notice and default in conjunction with failure to pay rent and abandonment of the premises manifests an intent to the contrary. See *Starr*, 31 Kan. App. 2d at 909.

Because Premier's failure to pay rent and its abandonment of the premises fell under section 9.1 rather than section 12.18, Town Center was not required to provide Premier with a notice of default or an opportunity to cure. Therefore, the district court properly ordered Premier to pay Town Center's attorney fees.

*Are the district court's findings of fact and conclusions of law supported by substantial competent evidence?*

Finally, Premier challenges several of the district court's findings of fact, stating that they are not supported by substantial competent evidence. Premier also contends that many of the conclusions of law adopted by the district court are erroneous. Town Center does not acknowledge this argument in its brief.

We could not find in the record where Premier contested the adequacy of the trial court's findings. " '[A] litigant must object to inadequate findings of fact and conclusions of law in order to give the trial court an opportunity to correct them. In the absence of an objection, omissions in findings will not be considered on appeal. Where there has been no such objection, the trial court is presumed to have found all facts necessary to support the judgment.' " *Gilkey v. State*, 31 Kan. App. 2d 77, 77-78, 60 P.3d 351, *rev. denied* 275 Kan. 963 (2003) (quoting *Hill v. Farm Bur. Mut. Ins. Co.*, 263 Kan. 703, 706, 952 P.2d 1286 [1998]). Determinations of fact which are not appealed from are final and conclusive. *In re Marriage of Phillips*, 274 Kan. 1049, 1050, 58 P.3d 680 (2002).

Nevertheless, it is disturbing that the district court held that Premier had ratified the action of Bayer in signing Lease 3. This mistake could have been averted had the trial judge not adopted all of Town Center's findings of fact and conclusions of law. Because a trial court's findings and conclusions are the very essence of the judicial function, they should not be surrendered to counsel. See Supreme Court Rule 165 (2006 Kan. Ct. R. Annot. 216); *Sierra*

*Club, Lone Star Chap. v. Cedar Point Oil,* 73 F.3d 546, 574 (5th Cir. 1996).

Affirmed.