NOT DESIGNATED FOR PUBLICATION

No. 115,374

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

GREGORY S. RODMAN and PRACTICE INTEGRATIONS, LLC,
*Appellants*,

v.

JASON J. MATZKE, JODY MAYER, and SLEEPELITE,
SLEEP DIAGNOSTICS of OKLAHOMA, LLC,
*Appellees*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; SETH L. RUNDLE, judge. Opinion filed February 16, 2018.
Affirmed.

*Marc A. Powell*, of Powell Law Office, of Wichita, for appellants.

*Jeffery L. Carmichael*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, for
appellees.

Before HILL, P.J., MCANANY and ATCHESON, JJ.

PER CURIAM:  Plaintiff Gregory S. Rodman claimed he was promised or otherwise
legally entitled to an ownership interest in a company that diagnoses sleep disorders.
Defendants Jody Mayer and Jason J. Matzke, the company owners, countered that
Rodman was hired as an independent contractor to manage the operation and received a
share of the profits as an incentive to do good work. A jury sitting in Sedgwick County
District Court heard testimony and reviewed documentary evidence about the business
relationship in a six-day trial and entered a verdict rejecting Rodman's claim. Rodman

1

has appealed the verdict and resulting judgment on multiple grounds focusing on the jury instructions. We find no material error in the district court proceedings and affirm.

Mayer and Matzke filed a conditional cross-appeal on their argument that Rodman's action was barred by a statute of limitations defense. Because we otherwise affirm the judgment in their favor, we need not and do not consider the cross-appeal. Mayer and Matzke have also appealed the district court's imposition of sanctions against their lawyer. Sanctions are typically entrusted to the district court's judicial discretion. We find no abuse here and affirm the $660 award.

FACTUAL AND PROCEDURAL INTRODUCTION

In 2005, Mayer and Matzke set up and began operating a clinic in Wichita that uses specialized equipment and techniques to determine if a person has a sleep disorder. At least during the time relevant to this litigation, the clinic was located in a major hospital and mostly or exclusively saw patients referred by physicians or other healthcare providers. The precise nature of the clinic's patient services is irrelevant to this dispute. Mayer and Matzke formally operated the clinic through SleepElite, Sleep Diagnostics of Oklahoma, a limited liability company, which is also a named defendant.

Mayer, Matzke, and Rodman knew each other from years earlier when all three worked at a similar clinic. Mayer and Matzke then formed SleepElite and owned a number of sleep clinics in Kansas and several other states. Rodman moved on to a property management company but kept in contact with Mayer and Matzke. Rodman became aware that the Wichita hospital wanted to replace the sleep clinic with which it had been associated. He alerted Mayer and Matzke about the opportunity. SleepElite entered into a contract with the hospital and started up its Wichita sleep clinic in September 2005. Rodman was not involved in the contract negotiations between SleepElite and the hospital.

2

After formalizing arrangements with the hospital, Mayer and Matzke brought in Rodman on the Wichita clinic. That bringing-in sits at the center of the legal controversy that occupied the jury and now commands our attention. Rodman contends he had an ownership interest in the Wichita sleep clinic. Mayer and Matzke counter that he was and always remained an independent contractor hired to manage the clinic—no ownership involved. The three never reduced the terms of the business relationship to a written contract, and there were no preliminary documents, such as a letter of intent or engagement, that might have illuminated their understanding.

As compensation for his services, Rodman received one-third of the net profits from the Wichita sleep clinic and a monthly minimum guarantee. He set up Practice Integrations, a limited liability company, to which SleepElite paid his compensation. Practice Integrations is also a plaintiff in this case. Rodman would later cite the compensation scheme as evidence of a business relationship that entailed an ownership interest in the clinic. Mayer and Matzke said the profit-based pay simply afforded Rodman a financial incentive to entrepreneurially promote and expand the clinic. The clinic was profitable throughout Rodman's association with the enterprise. So nobody has actual evidence of what would have happened if the clinic operated at a net loss and, more particularly, how Rodman would have been affected.

The relationship between Mayer and Matzke, on the one hand, and Rodman, on the other, started to fray in early 2010, and they unhappily parted ways during the late summer. Rodman was last compensated in September 2010.

Rodman and Practice Integrations filed this action in September 2013, naming Mayer, Matzke, and SleepElite as defendants. The parties undertook discovery and filed various pretrial motions that don't bear directly on the appeal. The jury heard the case in October 2015 and rendered a verdict for the defendants, finding neither Rodman nor

3

Practice Integrations had a partnership interest in the sleep clinic and, thus, against their claim for partial ownership. The district court later resolved various posttrial motions and entered judgment in conformity with the jury verdict. Rodman timely appealed. Mayer and Matzke have cross-appealed.

## ANALYSIS

Rodman has asserted multiple trial errors. We take those up and then turn to the cross-appeal. We add facts and procedural history as necessary to frame each appellate issue.

*Rodman's Appeal*

• For his first issue on appeal, Rodman contends the district court erred in declining to instruct the jury on whether he and particularly Practice Integrations had entered into a joint venture with Mayer, Matzke, and particularly SleepElite. In the final pretrial order, Rodman identified a joint venture between Practice Integrations and SleepElite as a claim for the jury's consideration. The district court declined to instruct on the theory because there was no evidence of a joint venture agreement between those entities. On appeal, Rodman seems to expand his claimed error to encompass any sort of joint venture arrangement related to the sleep clinic.

The district court, however, gave the jurors a detailed instruction on determining if the parties had formed a partnership, including factors to be considered in making that determination. The instruction applied to partnerships formed by agreement and those created by a course of conduct of the participants.

Even assuming the business relationship might have been characterized as a joint venture rather than a partnership, the failure to so instruct the jurors would have been

4

harmless error given the facts of the case and the substantial similarities between partnerships and joint ventures. The principal difference lies in the scope of the enterprise. A joint venture entails a single commercial opportunity, and a partnership contemplates a broader, ongoing business. *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.*, 226 Kan. 70, 75, 596 P.2d 816 (1979) (joint venture); *Foley & Loomis v. Phillips*, 211 Kan. 735, 739, 508 P.2d 975 (1973) ("A joint venture is distinguished from a partnership in that the joint venture generally relates to a single business venture with limitations as to purpose and extent of the operation."); *Potts v. Lux*, 161 Kan. 217, 221, 166 P.2d 694 (1946) (partnership). For example, development of a particular oil and gas lease would be a joint venture, while an unincorporated business formed to explore for oil and gas likely would be a partnership. In some circumstances, it may be difficult to categorize the enterprise, especially if the parties have not. Here, as we have said, Rodman had no written agreement with or other formal documents from Mayer and Matzke characterizing their relationship.

The factors considered in determining if parties have formed a joint venture or a partnership in contrast to some other business association are effectively the same. *Modern Air Conditioning*, 226 Kan. at 76; *Potts*, 161 Kan. at 222; see *Neighbors Construction Co., Inc. v. Seal-Wells Construction Co., Inc.*, 219 Kan. 382, 385, 548 P.2d 491 (1976) ("[J]oint ventures and partnerships are so similar in nature that they are governed by the same rules of law."). As recited in the cases, the factors function as indicia to be considered holistically with no one being necessary or controlling. *Modern Air Conditioning*, 226 Kan. at 76; *Potts*, 161 Kan. at 222. They look at the sharing of profits and losses, joint ownership of property, and community of control over the business operations.[*]

[*]In *Modern Air Conditioning*, the court recognized these factors as indicative of a joint venture: "(1) the joint ownership and control of property; (2) the sharing of expenses, profits and losses, and having and exercising some voice in determining the division of the net earnings; (3) a community of control over and active participation in

5

the management and direction of the business enterprise; (4) the intention of the parties, express or implied; and (5) the fixing of salaries by joint agreement." 226 Kan. at 76. Those factors have been incorporated into the standard jury instruction on the formation and existence of a joint venture. See PIK Civ. 4th 107.26. The indicia of a partnership include: "Intention of parties to the contract; sharing in profits and losses; charging of losses against accumulated profits; community of control over management and direction of the business; active participation in management of the affairs of the enterprise; joint control and exercise of ownership over all or part of the business assets; participation in division of the net earnings; sharing in payment of expenses of operation; fixing of salaries by joint agreement; investment in the business of undistributed profits for the purpose of building up a substantial cash reserve; division of undistributed profits in the event of liquidation contingent upon repayment to one of the parties of cash originally invested in capital." *Potts*, 161 Kan. at 222. The comment to PIK Civ. 4th 107.20, which addresses the definition and formation of partnerships, identifies the *Potts* indicia for use in the instruction. The district court drew heavily on those factors in fashioning the jury instruction given in this case.

In sum, the tests for the formation of a joint venture and of a partnership look at the same circumstances. The instruction the district court gave on whether there was a partnership would have sufficed to inform the jurors on a joint venture, as well. So Rodman could not have been prejudiced by the absence of an instruction cast using the term joint venture. In *George v. Capital South Mtg. Investments, Inc.*, 265 Kan. 431, 961 P.2d 32 (1998), the court recognized there could be no error when jurors were instructed on "the substance of the factors" related to joint ventures identified in *Modern Air Conditioning*, even if the instruction did not mirror their precise formulation. 265 Kan. at 455. Rodman has shown no basis for relief on the ground that the district court failed to specifically instruct on the formation of joint ventures in addition to partnerships. In applying the trial evidence to those factors, the jurors necessarily would have come to the same conclusion they did on the partnership claim.

• Rodman contends the district court's detailed jury instructions on contract formation necessarily and prejudicially diverted the jurors from his alternative claim that he, Mayer, and Matzke had formed a partnership through their collective course of

conduct rather than by agreement. We find no error, and any possible error would have been harmless in light of the evidence.

As a general matter, a district court should instruct a jury on those claims and defenses sufficiently supported in the evidence that reasonable jurors could return a favorable verdict on any of them considering the evidence in the best light for the specific claim or defense. *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, Syl. ¶ 3, 228 P.3d 1048 (2010). Rodman consistently asserted he was entitled to an ownership interest in the Wichita sleep clinic. But his legal theories or claims for entitlement evolved as the case progressed.

In his amended petition, Rodman alleged there was a "joint venture partnership" and claimed his association with Mayer and Matzke had been created through oral contracts for either a joint venture or a partnership. In the final pretrial order, Rodman reasserted his oral contract theories and claimed a joint venture had been formed by the parties' course of conduct. During trial, Rodman's approach seemed to shift in emphasis from contract to course of conduct. Mayer and Matzke steadfastly argued they never entered into a contract with Rodman giving him an ownership interest in the clinic. They contended he was hired as an independent contractor to manage the clinic and their course of dealing was consistent with that nonownership arrangement.

Based on the contested issues outlined in the pretrial order and the presentation of evidence, the district court needed to instruct the jurors on the law bearing on the formation of oral contracts. The district court provided three instructions on contracts and their formation. The initial instruction consisted of a single sentence defining or describing a contract. The next provided the elements of a claim for breach of contract. And the last outlined and explained contract concepts such as offer, meeting of the minds, acceptance, counter-offer, and rejection. The instructions match those in PIK Civ. 4th 124.01, 124.01-A, and 124.04. We do not understand Rodman to say those instructions

7

contained inaccurate recitations of the law, but rather that they effectively squeezed out his course-of-conduct claim by their sheer volume.

Given the nature of a contract claim, those instructions necessarily covered a lot of territory—they summarize key principles taught in an entire law school course. The first and third instructions could have been combined into a single instruction, thereby physically reducing the number of pages. But that would have been no more than an incidental cosmetic change. The district court also included a separate jury instruction explaining the concept of an independent contractor. The jurors needed the information imparted in the instructions to understand the law applicable to the factual conclusions they drew from the evidence in light of the claims and defenses presented. From that perspective, we see no error.

The district court also provided an instruction informing the jurors that Rodman contended "[a] partnership existed among the parties based on the actions of the parties between 2005 and 2009." That language embraces both contract formation and course of dealing, since each depends upon "actions" of the participants. Dovetailing with that instruction, the district court also instructed the jurors that participants in a commercial enterprise may become partners "whether or not the persons actually intended to form a partnership." That language, included in the instruction outlining the indicia of a partnership, directly informed the jurors that business associates could be partners based on their dealings with each other even if they never expressed any intent or forged any formal agreement to be partners. Those instructions capture and convey Rodman's course-of-dealing claim for the jurors. The concept may not require as much verbiage to explain as the contract claim, but the law imposes no "equal space" requirement when it comes to jury instructions.

A district court's instructions should accurately and concisely present the jurors with the relevant legal principles they need to evaluate the evidence and to apply the facts

8

to the parties' claims and defenses. The instructions did so here with respect to contract formation and course of conduct. How best to emphasize those instructions falls to the lawyers. The art of trial advocacy includes a lawyer's skill in weaving the evidence together with key legal concepts drawn from the instructions into a closing argument that is both compelling narrative and persuasive reasoning leading the jurors to a favorable verdict. In short, the district court's job is to explain the law in the jury instructions, and it is the lawyers' job to highlight that law to their respective clients' best advantage. The instructions sufficiently covered Rodman's course of conduct theory.

• Rodman contends the district court erred in declining to instruct the jury on whether an implied covenant of good faith and fair dealing applied to his business relationship with Mayer and Matzke. Kansas appellate courts recognize that contracts except those governing at-will employment contain implied covenants of good faith and fair dealing. *Morriss v. Coleman Co.*, 241 Kan. 501, 518, 738 P.2d 841 (1987); *Bank of America, N.A. v. Narula*, 46 Kan. App. 2d 142, 170, 261 P.3d 898 (2011). The covenant precludes one party to the contract from doing anything to prevent the other party from performing his or her contractual obligations or from receiving the benefits due under the agreement. 46 Kan. App. 2d at 170. An implied covenant of good faith and fair dealing depends upon the existence of an underlying contractual relationship; it does not exist and cannot be enforced or breached in a vacuum.

As we have pointed out, Rodman claimed an ownership interest in the sleep clinic and that Mayer and Matzke had deprived him of that interest. The claim necessarily hinges upon an arrangement, set forth in the instructions as a partnership, derived from either an oral contract or a course of conduct. The jury, of course, rejected that theory and found no partnership. In the absence of a partnership arrangement, there could have been no implied covenant binding Mayer and Matzke with Rodman. So from that hindsight perspective, the absence of a jury instruction on an implied covenant could not have disadvantaged Rodman.

9

Viewed prospectively, as well, Rodman's claims for relief didn't really depend upon an implied covenant. If a partnership existed (whether by oral contract or course of conduct), then Mayer, Matzke, and Rodman all would have had ownership interests in the enterprise. It wouldn't be a partnership otherwise. That's essentially definitional and doesn't depend upon an implied covenant of good faith and fair dealing. In other words, the partnership creates the implied covenant and the ownership interest rather than the implied covenant creating the partnership and the ownership interest.

What Rodman sought in this case was an ownership interest in the sleep clinic and the resulting financial benefits continuing through the time of trial. An implied covenant of good faith and fair dealing has nothing to do with those claims, since there could be an implied covenant covering Rodman only if he otherwise had an ownership interest. So the district court correctly declined to instruct on the law concerning what amounts to a superfluous legal concept. See *State v. Miller*, No. 109,716, 2015 WL 3632029, at *6 (Kan. App. 2015) (unpublished opinion) ("A jury instruction correctly characterized as superfluous or irrelevant shouldn't be given."). If this case were about Mayer and Matzke trying to buy out a partnership interest everyone agreed Rodman owned, then an implied covenant of good faith and fair dealing would have required them to use a reasonable method of valuing that interest in the absence of a contractually agreed upon formula fixing a value. See *Leone v. Owsley*, 810 F.3d 1149, 1157-58 (10th Cir. 2015). But that case isn't this case.

• The jury instruction outlining the indicia for a partnership includes the "[f]ixing of salaries by joint agreement" as one of the factors. During deliberations, the jurors posed related written questions to the district court asking whether that factor applied to the one-third share of the sleep clinic's profits and to salaries of the partners, the employees of the sleep clinic, or both. After consulting with the lawyers, the district court simply informed the jurors in writing that the instruction "does not refer to fixing salaries

10

of employees." On appeal, Rodman essentially reprises his arguments to the district court on how to answer the questions. He contends the proper response to the question about the profits would have informed the jurors they should consider how Mayer, Matzke, and Rodman decided they should be paid. He contends a separate answer to the second question should have directed the jurors to consider the setting of salaries for both partners and employees.

A district court is obligated to respond in some way to a question from a deliberating jury and must endeavor to provide a "meaningful" answer. See *State v. Boyd*, 257 Kan. 82, Syl. ¶ 2, 891 P.2d 358 (1995); *State v. Jones*, 41 Kan. App. 2d 714, 722-23, 205 P.3d 779 (2009). A district court is afforded broad discretion in fashioning the content of an answer, so long as the answer is, in fact, responsive to the question and contains no material misstatements. *Boyd*, 257 Kan. 82, Syl. ¶ 2; *State v. Ramey*, 50 Kan. App. 2d 82, 102, 322 P.3d 404 (2014). A district court oversteps that discretion if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal framework appropriate to the issue. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013); *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011).

As to the first question, the district court's answer substantively conformed to what Rodman wanted. He requested a standalone answer affirmatively referring to the parties. The district court essentially gave a negative answer expressly excluding employees, effectively leaving only the parties. The two responses are functionally equivalent. Rodman, therefore, cannot demonstrate error in that respect.

As to the second question, the fixing of salaries as a factor set out in the jury instruction doesn't obviously refer to employees of the partnership. Those salaries would be business expenses encompassed in other indicia, such as control over the management

11

of the business and sharing payment of expenses. Conversely, agreement of the participants as to their own salaries or regularly paid compensation (in addition to distribution of net profits) would be indicative of a partnership arrangement. But other indicia would also tend to encompass partnership salaries, as well. The facts of this case, however, do not require us to plunge deeper into that puzzle or to resolve it.

In this case, the evidence showed that Mayer, Matzke, and Rodman did discuss salaries for employees of the sleep clinic. Superficially, that might seem to support Rodman's position. But Mayer and Matzke said Rodman was hired to manage the sleep clinic. And those duties would have involved setting compensation for actual employees within general parameters that Mayer and Matzke, as the partners, established. As a result, the fixing of employee salaries wasn't really relevant to the fundamental question of the business relationship of Mayer, Matzke, and Rodman, since it was consistent with Rodman's theory of the case and with Mayer and Matzke's contrary theory. See *State v. Otero*, No. 114,762, 2017 WL 4183208, at *6 (Kan. App. 2017) (unpublished opinion) ("Relevant evidence makes a disputed, material fact either more or less likely true."). The district court's answer waved the jurors away from the fixing of employee salaries— essentially a legally irrelevant consideration under the circumstances. We see no abuse of discretion in the district court's response.

• Rodman contends the district court erred in failing to instruct the jurors on what he characterizes as partnership by estoppel—the idea that various casual references to him as a partner of Mayer and Matzke actually made him one. At the outset, we question whether Rodman ever identified such a theory in his amended petition or, more significantly, in the final pretrial order. See *Bussman v. Safeco Ins. Co. of America*, 298 Kan. 700, 708, 317 P.3d 70 (2014) (pretrial order "controls the course of the action" and defines the extant issues and claims). We pass over that conspicuous barrier to discuss what we understand to be the substance of Rodman's argument.

12

The evidence showed that in some informal settings Matzke introduced or described Rodman as a partner in the sleep clinic, including to representatives of the hospital where the clinic was housed. In an e-mail to a hospital employee, Matzke once referred to Rodman as a "strategic partner." From time to time, Rodman purportedly described himself as a partner in the clinic. We take Rodman's partner-by-estoppel claim to play off the well-accepted legal concept of apparent authority.

A business enterprise may outwardly treat someone as if he or she were an authorized agent when, in fact, there is no agency relationship. *Dealer's Leasing, Inc. v. Allen*, 26 Kan. App. 2d 745, Syl. ¶ 3, 994 P.2d 651 (1999). Should a third party reasonably rely on that overt treatment and deal with the person as an actual agent of the business, the business may then be bound by the conduct of that person with the third party. *Town Center Shopping Center v. Premier Mortgage Funding, Inc.*, 37 Kan. App. 2d 1, Syl. ¶ 3, 148 P.3d 565 (2006). That's because the business, through its own actions, cultivated the appearance of authority in that person and in equity and fairness should not be able to later deny the reasonably foreseeable consequences of those actions. The doctrine has been referred to as apparent authority and incorporates principles of estoppel and reasonable reliance. See *Wesly v. National Hemophilia Foundation*, 77 N.E.3d 746, 755 (Ill. App. 2017); *Amerigroup Texas, Inc. v. True View Surgery Center, L.P.*, 490 S.W.3d 562, 565 (Tex. App. 2016). The doctrine governs business or financial relationships between the entity creating the apparent authority and the entity relying on the apparent authority. What the doctrine doesn't do, however, is turn the apparent agent into an actual agent with general authority to bind the principal.

As we have said, Rodman tries to extrapolate from the concept of apparent authority to say that casual references—including his own—to being a "partner" in SleepElite communicated to outsiders actually rendered him a legal partner when he otherwise was not. We find the theory to be, in a word, dumbfounding. Rodman offers no direct authority for what appears to be an untenable stretch of the law and cites only cases

13

discussing general principles of apparent authority or estoppel. We could expound upon the common use of the term "partner" as simply conveying the idea of a close association rather than participation in a formal partnership. See Merriam-Webster's Collegiate Dictionary 904 (11th ed. 2003) ("partner" defined as "one associated with another esp. in an action[,]" thus a "colleague"). Or how the phrase "strategic partner" partakes of biz-speak—right next to outside-the-box thinking and win-win solutions—rather than precision in describing a specific legal relationship. But we defer.

Since Rodman's theory lacks any sound legal foundation, the district court should not have instructed the jurors on it. See *Foster v. Klaumann*, 296 Kan. 295, 301-02, 294 P.3d 223 (2013) (requested jury instruction must be legally appropriate). The point is without merit.

• Rodman contends the district court erred in denying his motion for a directed verdict or judgment as a matter of law that he had a partnership interest in the sleep clinic. In his brief, Rodman surveys the evidence largely to his advantage to suggest the district court ruled incorrectly.

In considering a directed verdict, the district court applies the same standards that govern motions for summary judgment. Any conflicts in the evidence must be resolved in favor of the party opposing the motion, and that party likewise must be given the benefit of all inferences reasonably drawn from the evidence. If a reasonable jury could not possibly return a verdict for the nonmoving party under that view of the evidence, then the district court should grant the motion for a directed verdict. *Siruta v. Siruta*, 301 Kan. 757, 766, 348 P.3d 549 (2015). Because granting or denying the motion requires no fact-finding, the propriety of the district court's ruling presents a question of law we review without deference. 301 Kan. at 766.

14

We find the district court ruled correctly. There were disputed issues of material fact bearing on the business relationship Rodman, on the one hand, had with Mayer and Matzke, on the other, with respect to the sleep clinic. We need not survey here the breadth of those disputed facts.

But, for example, Rodman said his receipt of one-third of the net profits from the clinic illustrated that he had a partnership interest in the business. And K.S.A. 56a-202(c)(3)(ii) creates a presumption that compensation based on a share of profits indicates a partnership relationship *unless* the recipient is being compensated for services as an independent contractor. Mayer and Matzke asserted that Rodman was an independent contractor managing the sleep clinic without an ownership interest in it. They said the compensation plan was designed to give Rodman a financial incentive to develop new sources of business for the clinic. The differing characterizations of the intent and purpose behind Rodman's compensation scheme entail conflicting factual representations for the jurors to resolve. See *Grosshans & Petersen, Inc. v. Givens*, 191 Kan. 650, 652, 383 P.2d 959 (1963) (explaining bifurcation of functions of judge and jury in determining existence of a partnership: what constitutes a partnership is a question of law for the court, but resolution of conflicting facts relevant to the nature of the business relationship is for the jury).

Similarly, by way of example, Rodman asserted he had an oral agreement with Mayer and Matzke giving him an ownership interest in the sleep clinic from the start. They denied any such agreement or representations had been made to Rodman. The evidence included e-mail exchanges about two and half years after the sleep clinic opened in which Rodman represented, "I guess I am at the point that I have 'NO IDEA' of where things truly stand and unfortunately at this time, I do not have the security of any agreement or understanding that I can refer back to for reassurance." In a return e-mail, Matzke replied that he had "[n]o problem in your request for us to define everything now." He represented he would talk with Mayer and they would "get back with you once

15

we've had an opportunity to get something down." As the trial evidence showed, the three never entered into a written agreement defining their business relationship. As the e-mail evidence demonstrates, there were factual representations that appear inconsistent with Rodman's assertions of an oral agreement going back to the inception of the business relationship. The jurors had to take account of the entire arc of the five-year business relationship and assess all of that circumstantial evidence to arrive at a factual determination as to the nature and scope of that relationship.

Those examples are both illustrative of the conflicting evidence and sufficient alone to support the district court's denial of Rodman's motion for a directed verdict. We find no error in that ruling.

*Mayer and Matzke's Cross-Appeal*

• Mayer and Matzke filed a conditional cross-appeal of the district court's denial of their statute of limitations defense. Parties prevailing in the district court may cross-appeal on issues they have lost in the district court when those issues would furnish alternative legal bases for partially or fully supporting their judgments. Should a judgment be vulnerable on a ground the losing party has raised on appeal, the appellate court can then look at the cross-appeal to see if it, nonetheless, may salvage the judgment. See *Rose v. Via Christi Health System, Inc.*, 279 Kan. 523, 525, 113 P.3d 241 (2005) ("If a trial court reaches the right result, its decision will be upheld even though the trial court relied upon the wrong ground or assigned erroneous reasons for its decision.").

But if the appellate court denies relief to a losing party on the grounds he or she has raised and, thus, affirms the judgment, it has no reason to address the cross-appeal— that's what makes the cross-appeal conditional. In that situation, the appellate court would be offering what amounts to an advisory opinion on any issues raised in the cross-appeal, since those issues would not alter the parties' legal relationship. See *State ex rel. Schmidt*

16

*v. City of Wichita*, 303 Kan. 650, 659, 367 P.3d 282 (2016) ("Kansas courts do not issue advisory opinions."). We find ourselves in that posture with respect to Mayer and Matzke's statute of limitations issue and, therefore, decline to address the point.

• As we have indicated, Mayer and Matzke have also appealed the district court's ruling imposing sanctions of $660 on their lawyer for violating an order in limine during the trial. There is nothing conditional about the challenge to the sanctions, so we take up that aspect of the cross-appeal. On appeal, Mayer and Matzke do not dispute the amount of the sanction. They dispute whether sanctions were appropriate at all.

We gather that Rodman had been unemployed for some months before he apprised Mayer and Matzke about the opportunity for a sleep clinic in Wichita and then became involved in the project. Rodman filed a motion in limine to exclude evidence that he was "out of work" or "without a job" when he associated with Mayer and Matzke, arguing the information was irrelevant to the issues being tried and could tend to demean him in front of the jury. After a pretrial hearing, the district court entered a written ruling granting the motion with respect to testimony about Rodman being "unemployed, without a job, or the like." But the district court ruled that the lawyers could present evidence about Rodman's financial ability to make capital contributions to or assume liability for losses of any business enterprise.

Pretrial orders governing the admission of testimony or other evidence are inherently interlocutory and may be revised to account for how the contested issues develop during trial. The district court specifically reminded the lawyers that they should request a conference outside the jury's presence if they believed the order in limine ought to be revised.

During the trial, Rodman testified on cross-examination that he was "not short of cash" or in need of money before he began receiving compensation from SleepElite. The

17

lawyer for Mayer and Matzke then asked the district court to revisit the order in limine to allow him to inquire about Rodman's period of unemployment. After an extended discussion outside the jury's presence, the district court ruled that the lawyers could delve further into Rodman's financial condition. The district court then added that questions about whether Rodman had been "fired" were off limits but seemed to suggest a limited line of inquiry showing that Rodman had been unemployed for a number of months would be permissible.

When Rodman's trial testimony resumed, Mayer and Matzke's lawyer starting asking a question this way: "Do you recall that after you lost your job at Somnograph [objection interposed]." Rodman's lawyer immediately interrupted the question, arguing that it violated the revised order in limine. Mayer and Matzke's lawyer offered to withdraw the question, and the district court sustained the objection. Later that day, outside the jury's presence, the district court stated that the question amounted to an intentional violation of the limine order and indicated it would entertain a motion for sanctions from Rodman tied to the attorney fees he incurred in filing his motion in limine. Rodman filed a motion for sanctions along with his other posttrial motions.

The district court took up those motions several months after the trial. Pertinent here, the district court reiterated its view that the question entailed an intentional and material violation of the order in limine. Based on the representations of Rodman's lawyer about the attorney fees incurred for the motion, the district court imposed a monetary sanction on Mayer and Matzke's lawyer of $660 for violating the order.

As a general matter, district courts exercise judicial discretion in determining litigation abuses and imposing sanctions for them. See *Wood v. Groh*, 269 Kan. 420, 430, 7 P.3d 1163 (2000) (frivolous filings violating K.S.A. 60-211); *City of Neodesha v. BP Corporation*, 50 Kan. App. 2d 731, 775, 334 P.3d 830 (2014) (abusive discovery practices), *rev. denied* 302 Kan. 1008 (2015). The rule undoubtedly extends to violations

18

of orders in limine. See *Lasar v. Ford Motor Co.*, 399 F.3d 1101, 114-15 (9th Cir. 2005); *United States v. Avery*, 295 F.3d 1158, 1181 (10th Cir. 2002). We have already outlined our standard in reviewing a district court ruling for abuse of discretion. See *Northern Natural Gas Co.*, 296 Kan. at 935; *Ward*, 292 Kan. 541, Syl. ¶ 3.

Here, the district court modified its pretrial order to allow the lawyers to show that Rodman had been unemployed or without work before he associated with Mayer and Matzke in the sleep clinic enterprise. But the district court explicitly cautioned that the testimony or other evidence was *not* to indicate Rodman has been fired or otherwise involuntarily terminated. The phrase Mayer and Matzke's lawyer used in the offending question—"after you lost your job"—violated the revised order. To lose one's job rather plainly connotes an involuntary termination in contrast to, say, quitting one's job. A person typically does not by volition "lose" something of value or importance. See Merriam-Webster's Collegiate Dictionary 736 (11th ed. 2003) (definition of "lose," sense 3, "to suffer deprivation of : part with esp. in an unforeseen or accidental manner").

The district court promptly considered the objection, found the question to be an intentional violation of its order, and outlined a likely financial sanction to be imposed on the lawyer. The district court again examined the violation and the appropriate sanction when it took up posttrial motions. Mayer and Matzke's lawyer does not contend he was deprived of a fair opportunity to address the issue. The record shows he had that opportunity.

The district court understood what it had ordered and made a reasoned determination the question violated the order. The lawyer intentionally chose the words he used, and they conveyed a proscribed message. We find no abuse of discretion in the district court's conclusion—other judicial officers would have ruled the same way. We affirm the award of sanctions against Mayer and Matzke's lawyer.

19

In sum, then, we affirm the district court on all of the points presented to us and decline to take up and decide the conditional cross-appeal dealing with the statute of limitations defense.

Affirmed.